**ADVANCE, The, (UNITED STATES v.)**
[See United States v. The Advance, Case No. 14,425.]

---

## Case No. 93.

### The ADVENTURE.

[1 Brock. 235.][1]

Circuit Court, D. Virginia. Nov. Term, 1812.[2]

NON-INTERCOURSE ACT—PRIZE—RIGHTS OF CAPTORS—SALVAGE.

The Adventure, a British ship, with a cargo of British goods and merchandise, was captured by a French frigate on the high seas, pending a war between France and Great Britain, and was given by the commander of the French frigate, to the captain and crew of an American vessel which had been previously, on the high seas, captured, plundered, and burnt, by the same frigate, and who were detained on board of the French frigate, when the Adventure was captured. The American sailors brought the ship and her cargo into the port of Norfolk, in the state of Virginia, while the laws interdicting all commercial intercourse between Great Britain and the United States were in force, which declared it unlawful to import into the United States, goods, wares, and merchandise, of British growth and manufacture, "from any foreign port or place, whatever," and prohibited their introduction under pain of forfeiture and other severe penalties. *Held:* That this was no infraction of the non-intercourse laws, the ocean, which is the great highway of nations, not being a foreign "port or place" within the meaning of those laws. To constitute a violation of the law, the British goods, &c., must have been brought from

[1][Reported by John W. Brockenbrough, Esq.]
[2][Reversed by supreme court, 12 U. S. (8 Cranch,) 221.]

some port or place within the dominions of some foreign potentate or power.

[See The Astrea, 1 Wheat. (14 U. S.) 125; Rowe v. Brig and Cargo, Case No. 12,093.]

[In admiralty. Libel for salvage. Claim of forfeiture on behalf of United States. Decree of forfeiture by district court (decree nowhere reported; opinion not now accessible) reversed, and ship and cargo adjudged to libelants. Decree of circuit court for libelants reversed, on a different ground, by supreme court in The Adventure, 8 Cranch, (12 U. S.) 221.]

Appeal from the district court of Norfolk. The libellants filed their libel in the district court of Norfolk, in admiralty, praying that the ship Adventure and her cargo should be condemned and sold for their benefit, or that if it should appear that the same, or any part thereof, ought to be restored to any person or persons, as the former owner or owners thereof, then that the same might be restored upon the payment of such salvage as by law ought to be paid for them. The attorney for the United States also filed a claim on behalf of the United States, claiming the ship and her cargo as forfeited to the United States, the Adventure being a ship, owned by British subjects, and having brought into the port of Norfolk a cargo composed of goods, wares, and merchandise, of the growth, produce, or manufacture of Great Britain, in contravention of the act interdicting commercial intercourse between the United States and Great Britain.

The counsel for the libellants and the United States agreed [upon] the following case as the one arising under the evidence in this cause. The libellants in this cause were the master, supercargo, mates, mariners, and cook, of and belonging to, an American brig, called the Three Friends, which brig, navigated by the libellants, sailed from the port of Salem, in the state of Massachusetts, on the 11th day of October, 1811, laden with a valuable cargo, and bound on a voyage from thence to the port of Pernambuco, and to any other port or ports on the coast of Brazil. The Three Friends and her cargo, at the time of her sailing from Salem, were the property of Pickering Dodge, a citizen of Massachusetts. The brig proceeded on her destined voyage until the 14th day of November, 1811, when, having arrived in latitude 7° 58′ north, and longitude 25° west, of Greenwich, on the high seas, she was fallen in with and captured by a French frigate, called the Medusa, which frigate was accompanied by another French frigate called the Nymph. The crews of these two frigates, by command of their commodore, removed the libellants from the Three Friends on board of the Medusa, and then burnt and destroyed the brig and her cargo. After this event, the libellants were kept and detained on board of the Medusa until the 21st of November, 1811, when, in latitude 21° 29′ north, and longitude 32° 20′

west, from Greenwich, on the high seas, the Medusa fell in with and captured the ship Adventure, which is libelled in this cause. The French captors took, and made prisoners of war, of all the crew of the Adventure, took away such part of her cargo as they wished, and all her papers, and on the following day the commander of the Medusa made an unqualified donation to the libellants, at their request, of the ship Adventure, with the residue of her cargo. The libellants, after receiving the ship, proceeded in her for some port of the United States, and although too few in number to be equal to the task of navigating properly so large a ship, yet, after sustaining great labor, damage, and fatigue, and after a long and tempestuous voyage of 71 days, they at length arrived in the port of Norfolk, in Virginia, on the 1st of February, 1812. The Adventure, at the time of her capture by the Medusa, was a British ship, furnished with letters of marque and reprisal, armed with twelve guns, and navigated by seventeen seamen, and, together with her cargo, belonged to some British merchants residing in Liverpool, whose names are unknown, and was then bound on a voyage from Liverpool to the British island of St. Christophers, in the West Indies. At the period of the capture, open war existed between France and Great Britain, and the cargo of the Adventure, which was brought into the United States, consisted entirely of articles of the growth or manufacture of Great Britain.

The district court decreed, "that the said ship, Adventure, her tackle, apparel, and furniture, together with the cargo, brought in the said vessel, into the port of Norfolk, within the district of Virginia, be forfeited for entering a port of the United States in violation of the 'act to interdict the commercial intercourse between the United States and Great Britain and France, and their dependencies, and for other purposes,' and of the act supplementary thereto:" and from this decree the libellants appealed to this court. [Reversed by supreme court, 12 U. S. (8 Cranch,) 221.]

MARSHALL, Circuit Justice. The only question made at the bar in this case is:—Are the ship Adventure and her cargo forfeited to the United States, as having contravened the act interdicting commercial intercourse between this country and Great Britain? Act March 1, 1809; 2 Story, Laws U. S. 1114–1120, [2 Stat. 528.] The Adventure was a British ship, captured by the Medusa, a French frigate; and presented to the libellants, who were the master, supercargo, and mariners, of the American brig Three Friends, which brig, with her cargo, had been previously captured and burnt by the same frigate. The Adventure was navigated into the port of Norfolk, and there libelled by the sailors to whom she had been

given. The United States filed their claim to the vessel and cargo as forfeited.

The clause of the law supposed to be infringed, is in these words:—"Nor shall it be lawful to import into the United States, or the territories thereof, from any foreign port or place whatever, any goods, wares, or merchandise whatever, being of the growth or manufacture of Great Britain or Ireland," &c. Section 4. The United States contend, that the Adventure and her cargo have incurred the penalties of this act. The libellants, that the case is not within the act. In argument, the impropriety of inquiring in this place into the policy of the law, and the legal principle that penal laws should be construed strictly, have both been made the subjects of animadversion. On these observations I will only say, what has been often before said in substance from this place, that the wisdom or folly of any particular system, is for the consideration of the legislature, not of the court; and when the policy of the law is mentioned by a judge, I always understand him to use the term in reference to the object of the legislature, and to the means by which that object is to be effected, as disclosed in the words they have employed.

The maxim, that penal laws are to be construed strictly, has never been understood, by me at least, to imply, that the intention of the legislature, as manifested by their words, is to be overruled; but that in cases where the intention is not distinctly perceived, where, without violence to the words or apparent meaning of the act, it may be construed to embrace or exclude a particular case. where the mind balances and hesitates between the two constructions, the more restricted construction ought to prevail; especially in cases where the act to be punished is in itself indifferent, and is rendered culpable only by positive law. In such a case, to enlarge the meaning of words, would be to extend the law to cases to which the legislature had not extended it, and to punish, not by the authority of the legislature, but of the judge. The counsel for the United States contend, that this case is within the plain letter of the law; and, to prove their position, have gone into a critical analysis of the sentence.

Although the disquisition is a dry one, and the arguments may appear nice, perhaps trivial, such as ought not to determine a question of property, it is deemed, by the court, to be one which is required by the character of the case. This part of the inquiry seems to turn on the meaning of the words "foreign place," as they stand in the act of congress. For the goods must be imported from a "foreign port or place," to come within the description of the law. The counsel for the claimants take these words in their most enlarged sense, and suppose that any place on land or water, within or without the dominion of any foreign power,

is a "foreign port or place," within the meaning of the act. It is worthy of remark. that this broad construction refuses to the words under consideration, any operation whatever. Expunge them, and the ambiguity of the sentence is removed. It means all that is required. This will be perceived, by reading the sentence without them, "Nor shall it be lawful," &c. If the act was drawn on reflection: if the legislature weighed the words they employed, it must have been perceived, that the words "from any foreign port or place whatever," could have no other operation. than to limit the broad meaning which the sentence without them would necessarily require. They were not wanting to exclude cases of goods, brought from one American port to another. because such an importation is not an importation into the United States. The words in question, then, operate restrictively, or they operate not at all. Unquestionably, redundancy in language, especially in legislative acts, is often seen; and, therefore, it would not be admissible to overrule the intention of the legislature, rather than pronounce a member of a sentence entirely useless. But in a case, where the intention is involved. in absolute uncertainty, the rule of construction which would give some effect to every part of the sentence is not to be entirely disregarded; especially, if, as in this sentence, the words appear to have had some importance attached to them by the legislature. It may also be noticed, that the same words are used frequently in the same section.—always denoting some place within the dominion of a foreign potentate. In all these cases, the word "place" is, in terms, limited to some spot within the territory of a foreign nation. This may aid in showing. that the place, in the mind of the legislature, was some place, not in air, or in water, but within the power and jurisdiction of a foreign state, which was capable of being resorted to, for the purposes of commerce. So, subsequently, in the same sentence, the words are used in the same restricted sense.

It certainly does not weigh much, yet it is something in determining the sense of an ambiguous phrase, that the word "place," throughout the law, is coupled with the word "port," or the word "country," by the disjunctive conjunction "or;" and a "port," or a "country," is necessarily within the limits of some state, or capable of being within those limits. This association would seem to indicate, that the word "place," also, is used in relation to a foreign territory; and is introduced, because, otherwise, the law might be evaded, by taking in a cargo at some place, not established as a port. But what weighs more than either or all of these arguments, is this: The broad navigable ocean, which is emphatically and truly termed the great highway of nations, cannot, in strict propriety of language, be denominated "a foreign place." The words are said to be

used to denote any place, not belonging to the United States. But the sea is the common property of all nations. It belongs equally to all. None can appropriate it exclusively to themselves; nor is it "foreign," to any.

If, then, the legislature designed to prohibit the importation of goods, acquired as was the cargo of the Adventure, they would either not have introduced the words foreign "port or place" into their law, or they would have added other words adapted to such intention. It ᴄᴀnnot be believed, that the legislature would have designated, by the term "foreign," a place in which the United States claim equality of dominion with other sovereigns. If this case comes within the act, the American sailors who have availed themselves of this fortunate occasion, as they deemed it, to return to their country, will be liable to a penalty of treble the value of the goods on board the vessel. Section 5. Could any court, or ought any court, to strain the meaning of words, in order to give such a judgment?

It is contended that the word "import" is co-extensive with the words "bring in." I am not prepared to controvert, or absolutely to admit, this proposition. But let it for the present be conceded. It will be perceived, that the argument which has been used allows that broad meaning to the word "import," and is founded on the meaning of the words "foreign port or place." But let us see how far we are unavoidably carried by establishing this construction of the word "import." Suppose the captain of the Medusa, instead of giving the Adventure to the American sailors, had brought her, with her cargo, into an American port, as a prize, would the penalties of the law have been incurred? Are gentlemen prepared to give this construction to the act? If they are not, the exception of such a case must be supported, either by the technical meaning of the word "import," or by allowing to the words "foreign place" the meaning which the court has given to them.

I will not put the case of a prize brought in by an American cruizer, because the war, and the consequent measures of government, may be considered as so far repealing the act of congress. But it is said, that if goods may be introduced as they have been, the law would become a dead letter, and the French flag would cover a prohibited trade, under the pretext of capturing British vessels and bestowing them on American sailors. This fraud presupposes a combination between the cruizer under the French flag, the British vessels to be captured, and the owners of those American vessels and cargoes, which must be previously destroyed, in order to furnish a case for the gift of a British vessel and cargo. This machinery would be too expensive to render the fraud so profitable as to be worth pursuing. In addition to the certain loss of the American vessels and cargoes there would be danger of detection, in which case the

penalties of the law would be incurred. But if, notwithstanding these safeguards, the mischief should grow to a size worthy of attention, the legislature can at any time furnish the correction, by expressing its will on that subject.

I cannot admit, that this importation is opposed more to the spirit and intention, than it is to the letter of the law. If I look either into the act itself, or into the contemporaneous history of my country, I am informed, that the object of the legislature was, by refusing the American market to British manufactures, to affect the manufactures, and through them the government. Therefore, the importation of British manufactures, not only from Britain, but from any foreign port or place whatever, was prohibited: for such foreign port or place might be made the medium through which the trade should be carried on. But bona fide belligerent captures cannot be made the medium of such a trade. Nor would the admission of goods, so captured, into the United States, benefit or relieve the British manufacturer or nation.

I think the case not within the act, and, therefore, that the sentence ought to be reversed and the subject condemned, and adjudged to the libellants.

NOTE. [from original report.] From the decree which was pronounced by the circuit court in this case, in conformity with the above opinion, the United States appealed to the supreme court, and that court reversed the decree of the circuit court. It will be perceived from the following analysis of the opinion of the supreme court, that the opinion of the chief justice, as far as it went, is entirely supported by it: but that the decree was reversed upon a new and distinct ground which was not touched in the circuit court. The supreme court said, that the most natural mode of acquiring a definite idea of the rights of the libellants in the subject-matter, would be, to follow it through the successive changes of circumstances by which the nature and extent of the rights of the parties were affected, viz.: the capture, the donation, the arrival in the United States, and the state of war.

1st. The capture. As between the belligerents, the capture produced a complete divestiture of property. It left nothing in the original British owner, but a mere scintilla juris, the spes recuperandi.

2d. The donation. Upon the donation, however absolute the right of the captor, or unqualified the gift, the donee could acquire no more than what was consistent with his neutral character to take. He could be in no better situation than a prize master navigating the prize, in pursuance of orders from his commander.

3d. The arrival in the United States. The vessel remained liable to British capture on the whole voyage, and on her arrival in a neutral territory, the donee sunk into a mere bailee for the British claimant, with those rights over the thing in possession, which the civil law gave for care and labor bestowed upon it. By the importation of the vessel, under the peculiar circumstances of the case, no forfeiture attached under the non-intercourse laws. The ship was the plank in the shipwreck; the tabula in naufragio; and it came within the description of property cast casually on our shores. To have carried the vessel infra praesidia of the enemy, unless forced by necessity to do so, would have been an unneutral act.

But by bringing her into a neutral port, where the original right of the captured would revive, and might be asserted, the libellants did an act exclusively resulting to the benefit of the British claimant. The libellants, therefore, were entitled to salvage: and in the absence of any express rule for ascertaining the amount, and under the circumstances of this case. they should be allowed, in different proportions which were ascertained by the court, one half of the amount of sales of the cargo, viz.: $8,000.

4th. The war. As war between the United States and Great Britain intervened, the British claimant could not interpose his claim for the residue, flagrante bello. But as the property was found here, at the declaration of war, it must stand on the footing of other British property similarly situated. and might be claimed, after the termination of the war, unless previously confiscated by legislative enactments.

The supreme court therefore decreed and ordered that the decree of the circuit court be reversed. that the costs and charges be paid out of the proceeds of sale; that one half of the balance be adjudged to the libellants, and that the balance be deposited in the Bank of Virginia, to remain subject to the future order of the court. After the termination of the war, the original British owners of the Adventure and her cargo preferred their claim, duly authenticated, in the circuit court, and the balance remaining to the credit of this cause in the Bank of Virginia was paid to them. The Adventure, 8 Cranch, [12 U. S.] 221.