# IN THE MATTER OF THE APPLICATION OF ISLAND AIRLINES, INCORPORATED.

## No. 4339.

July 22, 1963.

Tsukiyama, C.J., Cassidy, Wirtz, Lewis and Mizuha, JJ.

88

OPINION OF THE COURT BY WIRTZ AND LEWIS, JJ.

This opinion, supplementing the opinion of June 21, 1963, explains our holding on the first ground of intervenors' motions before the Public Utilities Commission,[1] which sought dismissal of Island Airlines' application for approval of rates and capitalization to operate a public utility business as a carrier of passssengers by air between the islands of Oahu, Maui, Hawaii and Kauai, subsequently amended to include Molokai and Lanai as well.

This first ground of intervenors' motions asserted that applicant's flights would be "between places in the same State through the airspace over any place outside thereof" within the meaning of the second clause of the definition of "interstate air transportation" in the Federal Aviation Act of 1958, 49 U.S.C.A., § 1301(21)(a). This point, if well taken, would lead to the conclusion that the Public Utilities Commission had no jurisdiction to regulate interisland air transportation, though authority

---

[1] Sometimes referred to herein as the "P.U.C."

over issuance of securities would remain. *Cf., In re Island Airlines, Inc.,* 44 Haw. 634, 637-39, 361 P.2d 390, 392-93. Applicant then would require federal certification under section 401 of the Federal Aviation Act of 1958 (49 U.S.C.A., § 1371) to carry any passengers, intrastate or interstate.

We have held, however, as stated in the opinion of June 21, 1963, that interisland air transportation is within the jurisdiction of the Public Utilities Commission; that an interisland air carrier does not, merely because of flying interisland, require a federal certificate from the Civil Aeronautics Board[2] under section 401 of the Federal Aviation Act of 1958 (49 U.S.C.A., § 1371); that the jurisdiction of the Civil Aeronautics Board over interisland air transportation depends upon the carriage by the carrier of persons or property "in commerce" between a place in one state and a place in another state under another part of the definition of "interstate air transportation" in the Federal Aviation Act of 1958; and that such C.A.B. jurisdiction is not exclusive of P.U.C. jurisdiction over intrastate traffic. It is our conclusion that applicant in flying interisland between places in this State will not be flying "through the airspace over any place outside thereof" within the meaning of the second clause of the definition of "interstate air transportation" in the Federal Aviation Act of 1958, 49 U.S.C.A., § 1301 (21) (a).

Two questions have been argued, *first,* whether the proposed flights of applicant will pass outside the boundaries of the State, and *second,* whether the boundaries of the State are the turning point when undoubtedly the flights will not traverse the airspace of any other jurisdiction, foreign or domestic.

The first Constitution of Hawaii was granted by

[2] Sometimes referred to herein as the "C.A.B."

Kamehameha III, October 8, 1840. By the second act of
Kamehameha III, enacted April 27, 1846, it was provided
in Part I, Chapter VI, Article I:

"SECTION I. The jurisdiction of the Hawaiian
Islands shall extend and be exclusive for the distance
of one marine league seaward, surrounding each of
the islands of Hawaii, Maui, Kahoolawe, Lanai,
Molokai, Oahu, Kauai and Niihau; commencing at
low water mark on each of the respective coasts of
said islands. The marine jurisdiction of the Hawaiian
Islands shall also be exclusive in all the channels pass-
ing between the respective islands, and dividing them;
which jurisdiction shall extend from island to island.

"SECTION II. It shall be lawful for His Majesty
to defend said closed seas and channels, and if the
public good shall require it, prohibit their use to other
nations, by proclamation.

"SECTION III. All captures and seizures made
within said channels or within one marine league of
the coast, shall be deemed to have been made, and all
foreign vessels entering therein, shall be deemed to
have entered in His Majesty's waters. The civil and
criminal jurisdiction shall be co-extensive with the one
maritime league, and the inter-island channels herein
defined. And the right of transportation and tran-
shipment from island to island, shall exclusively belong
to Hawaiian vessels duly registered and licensed to
the coasting trade, as in the two succeeding articles
prescribed." S.L. 1846, pp. 83-4.

Whatever constituted the Kingdom became the terri-
tory of the Republic of Hawaii. Const. of 1894, Art. 15.
However, it has been argued that the 1846 statute was
not a claim of jurisdiction over the channels between the
islands in terms of the boundaries of the Kingdom, and
that in any event such claim was not maintained after

enactment of the Civil Code of 1859, at which time the Second Act of Kamehameha III was repealed with immaterial exceptions. Civil Code 1859, § 1491. As will be seen we do not reach these questions.

Hawaii was annexed in 1898,[3] the Hawaiian Organic Act was enacted in 1900,[4] and the State was admitted in 1959,[5] the provisions pertinent to the boundaries being

---

[3] Annexation was effected by a cession made by the Republic of Hawaii by ratification by the Senate of the Republic on September 9, 1897 of a treaty, Article I of which provided:

"Article I. The Republic of Hawaii hereby cedes absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies; and it is agreed that all the territory of and appertaining to the Republic of Hawaii is hereby annexed to the United States of America under the name of the Territory of Hawaii."

and by acceptance of the cession by the Joint Resolution of Annexation approved July 7, 1898, 30 Stat. 750, reading in pertinent part:

"Whereas the Government of the Republic of Hawaii, having in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, * * * Therefore

"*Resolved by the Senate and House of Representatives of the United States of America in Congress Assembled,*

That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof * * *."

The reference to the Constitution of the Republic of Hawaii was to Article 32 of the Constitution of 1894, which provided:

"The President, with the approval of the Cabinet, is hereby expressly authorized and empowered to make a Treaty of Political or Commercial Union between the Republic of Hawaii and the United States of America, subject to the ratification of the Senate."

[4] Section 2 of the Hawaiian Organic Act, approved April 30, 1900, 31 Stat. 141, provided:

"That the islands acquired by the United States of America under an Act of Congress entitled 'Joint resolution to provide for annexing the Hawaiian Islands to the United States,' approved July seventh, eighteen hundred and ninety-eight, shall be known as the Territory of Hawaii."

[5] Public Law 86-3, approved March 18, 1959, 86th Cong., 1st Sess., 73 Stat. 4, hereinafter referred to as the Admission Act, provided for admission of the State upon proclamation by the President pursuant to section 7(c) of the act. The proclamation was issued August 21, 1959, Proclamation 3309, 24 Fed. Reg. 6868, 3 C.F.R., 1959 Supp., p. 60, after elections had been held pursuant to section 7(a) of the act, and after

as set out in the notes. In the Admission Act Congress stated that the State "shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii * * *," except Palmyra. Public Law 86-3, § 2, 73 Stat. 4, set out in full in note 5. Congress was aware that there was an unanswered question as to the jurisdiction over the interisland channels, to be determined according to "the previous statutory references" and "decisional laws."[6] At the time

---

the propositions submitted to the electors pursuant to section 7(b) had been adopted at the election of June 27, 1959. As provided by section 7(b), the adoption of these propositions caused section 1 of Article XIII of the proposed State Constitution to be amended, so that on admission it read as set out in section 2 of the Admission Act, *i.e.*:

"The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act, except the atoll known as Palmyra Island, together with its appurtenant reefs and territorial waters, but said State shall not be deemed to include the Midway Islands, Johnston Island, Sand Island (off shore from Johnston Island) or Kingman Reef, together with their appurtenant reefs and territorial waters."

As framed by the Constitutional Convention of 1950 and adopted at the election of November 7, 1950, to take effect upon the admission of the State, section 1 of Article XIII of the proposed State Constitution read:

"The State of Hawaii shall include the islands and territorial waters heretofore constituting the Territory of Hawaii."

Among the propositions submitted to the electors on June 27, 1959, and adopted, was proposition (2) reading:

"(2) The boundaries of the State of Hawaii shall be as prescribed in the Act of Congress approved................................, and all
(Date of approval of this Act)
claims of this State to any areas of land or sea outside the boundaries so prescribed are hereby irrevocably relinquished to the United States."

[6] Hearing before the Subcommittee on Territories and Insular Affairs, United States Senate, 86th Cong., 1st Sess., on S. 50, February 25, 1959, p. 59:

"Senator JACKSON [Chairman, Subcommittee on Territories and Insular Affairs]. Senator Church, we went into this at length in the 83d Congress, and we had a rather long and detailed description. The net result of it was that we decided that we should continue to refer to the previous statutory references and for the purpose of preserving whatever decisional laws that might be on the subject consistent with the descriptive language used in the past.

"That is what has been done, excepting and excluding in this case, Palmyra, which is technically today a part of the city limits of the

of the Constitutional Convention which framed the State
Constitution in 1950,[7] the Convention deemed the inter-

City of Honolulu. * * *"

This refers to Sen. Rep. No. 886, 83d Cong., 2d Sess., which at page
16, contained a detailed description with the statement that the Committee had considered it but decided against including it. That the
islands to be included were not the point in doubt also was stated. Pages
16-17. As explained by the then Committee Chairman, Senator Cordon
in response to questions, 83d Cong., 2d Sess., 100 Cong. Rec. 2789, cols.
1-2:

"Mr. DANIEL. Mr. President, I should like to ask the distinguished Senator from Oregon if it is his interpretation and if he
understands it also to be the interpretation of the Committee on
Interior and Insular Affairs that by means of this bill, we shall take
into the United States the Territory of Hawaii, with the boundaries
it has established, namely, the boundaries which now exist, except
for the specific exceptions mentioned in this amendment, namely,
'Palmyra Island, together with its appurtenant reefs and territorial
waters'; the Midway Islands; Johnston Island; Sand Island; and
the others which are specifically mentioned as not being included.

"Mr. CORDON. The Senator is correct in his assumption. That
is the committee's purpose.

"Mr. DANIEL. As the Senator knows, the main point I am driving at is whether or not it is the interpretation of the Senator from
Oregon, and if he understands it to be the interpretation of the committee, that whatever the territorial waters of the Hawaiian Islands
happen to be, they will be taken into the United States as they now
exist.

"Mr. CORDON. The Senator is correct.

"Mr. DANIEL. For example, as the Senator well knows, in the
earlier history of the Hawaiian Islands the King—and subsequently
the Territory—claimed certain waters between the main islands as
territorial waters, even though they are farther than 3 miles from
shore. Do I correctly understand that such claim of a wider territorial limit than 3 miles from shore between the main islands is
preserved, or whatever rights already exist are preserved by this
proposed legislation?

"Mr. CORDON. The Senator from Texas is correct. He will
recall that there is a question as to the continuity of that particular
claim; but Hawaii should be admitted into the Union as a State,
with whatever rights attached by virtue of the organization of the
Hawaiian Islands as a Territory, and whatever description the islands had as a republic, except as to the islands, sand spits, and
territorial waters expressly excluded by the amendment.

"Mr. DANIEL. For example, if the Territory had established
under international law an area of territorial waters between the
main islands more than 3 miles in width, such area would be taken
into the United States by this bill.

"Mr. CORDON. The Senator is correct. * * *"

[7] See note 5.

island channels part of the territorial waters of the Territory of Hawaii which would be included in the State.[8]

Senate Report 80, 86th Cong., 1st Sess., accompanying S. 50 which became Public Law 86-3, shows at page 4 that the Senate committee did not deem the channels part of the Territory of Hawaii. But it likewise shows at page 2 that "the boundaries of the new State will include all of the islands and territorial waters of the Territory of Hawaii, except the island of Palmyra." Thus the inclusion of the interisland channels as part of the State's territorial waters turns on the boundaries of the Territory of Hawaii.

The P.U.C. recognized that to determine the boundaries of the State it had to determine those of the Territory, but the findings of the Commission do not show with any exactitude what the Commission deemed the boundaries to be. In its preliminary Decision No. 1089 of December 20, 1961, denying intervenors' motions to dismiss, the Commission sustained its jurisdiction upon findings that:

"* * * the bodies of water which separate the islands of Hawaii and over which applicant's aircraft will fly as a common carrier are not outside the State of Hawaii.

"* * * We are satisfied from the evidence and law that has been adduced in this hearing that as of that date [the date of enactment of the Admission Act] the Territory of Hawaii then consisted of the 'terri-

---

[8] Stand. Com. Rep. No. 56, Committee on Miscellaneous Matters, reporting on Proposal No. 125 relating to the boundaries. This referred to the Hawaiian Organic Act and the Joint Resolution of Annexation, and stated that the words "territorial waters" were meant to include "not only the '3-mile limit' but the territorial waters between the named islands." Proceedings of the Constitutional Convention of Hawaii, vol. 1, p. 208. The report was presented and Committee Proposal No. 15, appended to the report, was adopted by the Committee of the Whole. Proceedings, vol. 2, pp. 696, 731. For adoption by the Convention after changes by the Committee on Style see Stand. Com. Rep. No. 111, Proceedings, vol. 1, p. 268, adopted pp. 114, 117. For change in numbering see Stand. Com. Rep. No. 137, Proceedings, vol. 1, pp. 290-94, adopted p. 139.

torial waters' over which applicant proposed to engage in air common carrier operations."

Applicant defined a channel as "a body of water between any two points on any two islands confronting each other," and contended that the State includes as a "minimum area" all areas of land and sea within a boundary marked on its exhibit 2, including in the State the waters of Alenuihaha Channel between the islands of Hawaii and Maui, Alalakeiki Channel between the islands of Maui and Kahoolawe, Kealaikahiki Channel between the islands of Kahoolawe and Lanai, Auau Channel between the islands of Lanai and Maui, Pailolo Channel between the islands of Maui and Molokai, Kalohi Channel between the islands of Molokai and Lanai, Kaiwi Channel between the islands of Molokai and Oahu, Kauai Channel between the islands of Oahu and Kauai, and Kaulakahi Channel between the islands of Kauai and Niihau.

We cannot tell from the record whether the boundary as asserted by applicant includes only channel waters or more besides. In some areas where the boundary contended for does not follow the coastline at the outer edge of the three mile belt, we cannot ascertain whether this is through lack of exactitude in the marking of exhibit 2 or because of applicant's theory as to the extent of the channels. No evidence was adduced as to the extent of the channels according to Hawaiian usage or ordinary usage.

In connection with the service into Kailua, Kona, Island of Hawaii, applicant submitted alternate routes. One of these is an indirect route which would follow the western coastline of the island north of Keahole Point. This would extend the flight time from Kahului, Maui, to Kailua, Kona, Island of Hawaii. Applicant evidently submitted the alternate route because the extent of Alenuihaha Channel is unclear. This is true both at the west end of the channel, where the service to Kona is involved,

and at the east end of the channel where applicant apparently includes as part of the channel the waters off the Hamakua coast and even further east, asserting a boundary which leaves the northeast coast of Hawaii and cuts across to Maui from a point in the vicinity of Hilo Bay.

According to applicant it would stay in the channels in any event, however they might be determined. It is contended on the other hand that applicant cannot stay within the channels on certain flights because F.A.A.[9] flight rules prevent it. This contention is based on the airways as presently established.[10]

There are two types of airways, VFR where visual flight rules obtain, and IFR under instrument flight rules. Any instrument airway is also adaptable to VFR operation.

Between Oahu and Kauai all the airways are instrument airways. On this flight, as testified by Mr. Brant, "you need navigational guidance because you are outside of the sight of land." This navigational guidance consists of an aural signal or a visual signal in the cockpit. Each airway is ten miles wide, to allow for human and mechanical error.

The regulations require that an aircraft operating IFR fly along the center line of the airway. Operating VFR, as testified by Mr. Brant:

"* * * I would say that he has some latitude, but when you are flying airways in which your navigational aid

---

[9] Federal Aviation Agency.

[10] It is to be noted that Joe E. Brant, Flight Standards Division, Federal Aviation Agency, testified that: "Generally speaking, * * * [a new carrier] would fly the established airways. That does not entirely rule out the possibility of establishing new types of routes, but generally speaking I would say it would be on the federal airways." He further testified: "* * * we are continually establishing and relocating and revising airways, putting in new facilities, and so forth. It's a continual process."

is the only means of navigating, there again you have to go to the center line and attempt to fly it. If the pilot is flying by pilotage, which he can actually see from one point to the next, there is latitude granted in that area."

There is no direct route between Oahu and Kauai because of the "highly congested area in the vicinity of Barber's Point Fan Marker and just to the west of the Barber's Point Fan Marker," according to Mr. Brant. This is a safety measure.[11]

The intersection "Pineapple" on the route between Oahu and Kauai was the subject of considerable argument. It is more than three miles off Barber's Point and is not within the boundaries of the State asserted by applicant in its claim of the "minimum area." However, applicant submitted an alternate contention that the southwest boundary runs from a point three miles off the southern end of Niihau to a point three miles off Ka Lae, the southernmost point on the island of Hawaii, without touching in the vicinity of Kauai, Oahu, Lanai or Kahoolawe.[12] According to this alternate contention, "Pineapple" is within the boundaries of the State.

Applicant further contends that even on the basis of the boundaries asserted as delineating the "minimum area" it is possible to remain within the boundaries because "it is not a matter of legal necessity on a visual

---

[11] As explained by the witness, Mr. Brant:
"* * * This is the instrument approach entry area to the Honolulu International Airport, as well as Barber's Point, and for that reason we actually do have some—well, it's considered a gentlemen's agreement, but it's published, flight paths to get out of the Honolulu area to circumnavigate this high-density area around Barber's Point, and that generally speaking comes around here to the vicinity of Pineapple intersection and on to Lihue. That is the reason I would say we don't authorize a route direct from Honolulu Airport to the Lihue Airport."

[12] The boundary asserted as delineating the "minimum area" of the State touches in the vicinity of each of these islands.

flight clearance to pass over the point 'Pineapple' * * *."
Mr. Brant testified that normally under VFR conditions,
a pilot approaching "Pineapple" would be within sight of
Barber's Point. Applicant contends that it would not have
to fly the center line under these conditions and could
remain within the boundaries. However, Mr. Brant
testified:

"Q  Mr. Brant, do I understand correctly that this
route from Lihue Airport to Honolulu which uses I
believe it was Pineapple intersection, Pineapple inter-
section is mandatory because of the congestion in the
Barber's Point area. I think in your testimony you
referred to that map on the wall there.

"A  I wouldn't say that flying right over Pineapple
intersection is absolutely mandatory. I'm sorry, I don't
have the chart showing the arrival and departure,
VFR arrival and departure areas for the Honolulu
area, but in general it takes you in the vicinity of the
Pineapple intersection. We are talking about VFR
operation."

Applicant makes the further argument that a new air-
way might be established,[13] and further argues that juris-
diction does not depend upon flight patterns.

In support of the latter contention applicant adduced
evidence of its President, Walton Wood, that under IFR
conditions a carrier approaching Los Angeles Interna-
tional Airport could be required to go outside the three-
mile limit on a flight from San Diego to Los Angeles or on
a flight from San Francisco to Los Angeles. Mr. Brant,
while testifying that he was "not current" on the instru-
ment approaches to Los Angeles agreed that applicant's
exhibit 9, "Enroute Low Altitude Chart" covering South-
ern California, showed check points "quite some distance

---

[13] See note 10.

to sea" on airways shown there, and we can see that the points mentioned by name ("Dolphin" and "Carp") are more than three miles off the coast. Mr. Brant further testified:

"Q What the FAA does in respect to any terminal, particularly with respect to instrument clearances is try to set up a safe holding pattern or multiple safe holding patterns and approach patterns, isn't that right?

"A That's correct, yes, and patterns that will expeditiously handle the flow of traffic safely.

"Q I take it that the distances that the holding patterns extend over have been growing greater and greater with larger equipment and heavier traffic, isn't that right?

"A Repeat.

"Q I said I take it that the distances that are covered by these patterns with the increase in traffic and the speed of the aircraft have tended to become larger in area?

"A It has increased the size of holding patterns. Obviously it has for the jet type of equipment."[14]

While the weather in the Hawaiian Islands is better

---

[14] These flight patterns have not interfered so far with jurisdiction of the California Public Utilities Commission over intrastate rates on flights, for example, between Los Angeles and San Francisco. The flight patterns were not considered in *People* v. *Western Air Lines, Inc.*, 42 Cal. 2d 621, 268 P.2d 723, *appeal dism'd for want of a substantial federal question sub nom Western Airlines, Inc.* v. *California*, 348 U.S. 859. In the brief of the Civil Aeronautics Board on the appeal in *Public Util. Comm'n* v. *United Air Lines, Inc.*, 346 U.S. 402, *reversing* 109 F. Supp. 13, the C.A.B. without mention of flight patterns treated flights between Los Angeles and San Francisco as involving "only flights over California territory * * *." Brief for appellee Civil Aeronautics Board, in the Supreme Court of the United States, No. 87, October Term 1953. The problem perhaps is of recent origin. The C.A.B. appearing as *amicus curiae* in this court noted the question of "the actual flight paths of the aircraft and their operations between the islands" but did not argue this point, devoting its argument to the question of the boundaries and the meaning of the Federal Aviation Act of 1958.

than on the mainland, as Mr. Brant agreed, he pointed out that it is "spotty" giving as an example "around Hilo." Points on IFR airways out of Hilo, Island of Hawaii, designated as "Hibiscus" and "Grass Shack" are more than three miles off the coast and not within any channel. The same is true as to points on instrument airways out of Kahului, Maui, reference being to points designated as "Sweet Pea" and "Bluefin." On a flight between Oahu and Kauai an alternate route via "Hula Girl" and "Orchid" might have to be used because of traffic density, and this route is even further outside the boundaries asserted as delineating "the minimum area" than the route via "Pineapple."

The Commission's decision does not show how it treated the flight patterns under IFR conditions, but it must have disregarded them as immaterial. Whether it accorded the same treatment to the usual route via "Pineapple," or thought that applicant would not have to fly the center line when Barber's Point came in view and could bypass "Pineapple," or concluded that the boundaries of the State encompass applicant's alternate contention and "Pineapple" is within the State—we cannot ascertain from the decision. Likewise we cannot ascertain from the decision whether, and if so on what basis, the Commission accepted applicant's computed flight time[15] into Kailua, Kona where, as seen, the extent of the Alenuihaha Channel was involved in the Commission's decision that applicant would be flying only over territorial waters.

Thus the first of the jurisdictional questions argued (i.e., whether the proposed flights of applicant will pass outside the boundaries of the State) could lead only to a requirement of supplementary findings and conclusions.

---

[15] The flight time is important not only in fixing schedules but also in estimating expenses.

In any event, therefore, whether we were to decide in favor of applicant on the first of the jurisdictional questions, or to decide against him holding that channel waters more than three miles off the coasts of the respective islands were not included in the Territory of Hawaii or that the IFR airways must be taken into consideration, we would and do reach the second of the jurisdictional questions argued, *i.e.,* whether the boundaries of the State are the turning point of the Commission's authority when undoubtedly the flights will not traverse the airspace of any other jurisdiction, foreign or domestic. On review of this second question we find it immaterial whether applicant's flights will or will not stay within the State's boundaries. Every consideration pertinent to the first question only serves to accentuate our conclusion that the Commission's authority does not turn on a determination whether applicant's flights will pass over the State's territorial waters or over international waters.

As in *Bob-Lo Excursion Co.* v. *Michigan,* 333 U.S. 28, the geographic situation cannot obscure the fact that the traffic here involved is of "highly local concern." The population of the neighbor islands has been declining while that of the State as a whole has increased. In the record there is testimony that due to the population decline in the neighbor islands the volume of travel by local residents (as distinguished from tourists) has increased very little if at all in the last ten years. One may ask rather whether the decline in the population of the neighbor islands is not due in large part to the isolation of those islands consequent upon one-way air fares[16] of $19.09 to or from Hilo, Hawaii, $16.91 to or from Kailua, Kona, Hawaii, and $12.55 to or from Kahului, Maui, or Lihue, Kauai, with no round trip discount in any case though

---

[16] Exclusive of federal transportation tax.

there is a family plan discount. No other transportation is available.

Necessarily, the local economy is directly involved in the regulation of interisland transportation. This is true as to the transportation of property as well. For example, at the public hearings held by the P.U.C. considerable interest was manifested in fast and economical air transportation for the shipment to Honolulu of fruits, vegetables, eggs and other produce. Here the very use of the rural lands is involved.

The absorption of state authority with respect to rate regulation has been referred to as the "delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions."[17] It has been the historic policy of Congress to leave under state control the regulation of rates for transportation between points in a single state though passing over international waters.[18] Did Congress depart from its historic policy in the Civil Aeronautics Act of 1938 (52 Stat. 973, 49 U.S.C.A., § 401 et seq.) and the Federal Aviation Act of 1958 (72 Stat. 731, 49 U.S.C.A., § 1301 et seq.)? Certainly as to surface carriers[19] Congress has not pre-empted control over rates.

---

[17] Palmer v. Massachusetts, 308 U.S. 79, 84, quoted in City of Yonkers v. United States, 320 U.S. 685, 690.

[18] Note 19, infra, et seq.

[19] In the Shipping Act "common carrier by water in interstate commerce" and "common carrier by water in foreign commerce" are defined to mean:

"* * * a common carrier engaged in the transportation by water of passengers or property on the high seas or the Great Lakes on regular routes from port to port between one State, Territory, District or possession of the United States and any other State, Territory, District, or possession of the United States * * *.

"* * * a common carrier, except ferryboats running on regular routes, engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country * * *." 46 U.S.C.A., § 801.

The definition of "common carrier by water in interstate commerce" also is used for the purposes of the Intercoastal Shipping Act (46 U.S.C.A., § 845b.)

for transportation between points in a single state merely because part of the route is over international waters. The P.U.C. is today the rate-making authority for water carriers between the islands.

Congress having, by the Transportation Act of 1940, 54 Stat. 898, 930, couched the delineation of the scope of federal economic regulation of water carriers (Part III of the Interstate Commerce Act) in terms of transportation "from a place in a State to a place in any other State" a question arose in 1941 as to the jurisdiction of the Interstate Commerce Commission over a water carrier which in moving vessels from points in New York to other points in New York via New York Harbor and the Hudson River, crossed the New York-New Jersey state line traversing the waters of New Jersey as well as those of New York. The Interstate Commerce Commission ruled that it had jurisdiction. *Cornell Steamboat Co. Contract Carrier Application*, 250 I.C.C. 301, 311-13; *id.*, 577, 579. The

---

In Part III of the Interstate Commerce Act, relating to water carriers, "transportation in interstate or foreign commerce" is defined to mean transportation of persons or property:

"(1) wholly by water from a place in a State to a place in any other State, whether or not such transportation takes place wholly in the United States;

"(2) partly by water and partly by railroad or motor vehicle, from a place in a State to a place in any other State; * * *

"(3) wholly by water, or partly by water and partly by railroad or motor vehicle, from or to a place in the United States to or from a place outside the United States, but only (A) insofar as such transportation by rail or by motor vehicle takes place within the United States, and (B) in the case of a movement to a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein prior to transshipment at a place within the United States for movement to a place outside thereof, and, in the case of a movement from a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein after transshipment at a place within the United States in a movement from a place outside thereof." 49 U.S.C.A., § 902(i).

(No attempt has been made herein to set out in any detail the provisions governing the jurisdiction of the Maritime Commission and Interstate Commerce Commission, respectively. See 46 U.S.C.A., § 832, 49 U.S.C.A.,

104

carrier then sued to annul the Commission's order and the District Court upheld the Commission. *Cornell Steamboat Co.* v. *United States*, 53 F. Supp. 349, 354-55 (S.D.N.Y.). On appeal the Supreme Court affirmed. *Cornell Steamboat Co.* v. *United States*, 321 U.S. 634, 638-41. The Court reasoned that:

"* * * While moving on New Jersey waters, Cornell's vessels are not at that time at 'a place' in New York. Certain of its towing activities therefore actually move vessels from places in New York to places in New Jersey and thence back to places in New York. Such movements, if made on land by rail carriers, would be classified as interstate for regulatory purposes under previous decisions of this Court;[4] and, as the Commission's opinion points out, these decisions have cast grave doubts upon the power of a single state to regulate such movements in whole or in part. * * * We

§ 920. Under section 18(a) of the Admission Act, Public Law 86-3, 73 Stat. 4, water carriers engaged in transportation between Hawaii and other states remain under the jurisdiction of the Maritime Commission.)

In Part I of the Interstate Commerce Act, relating to railroads and express companies, the provisions thereof are made applicable to the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water:

"From one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, * * * or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation or transmission takes place within the United States." 49 U.S.C.A., § 1(1).

In Part II of the Interstate Commerce Act, relating to motor carriers, "interstate commerce" and "foreign commerce" are defined to mean:

"* * * commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water."

"* * * commerce, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water, (A) between any place in the United States and any place in a foreign country, or between places in the United States through a foreign country * * *." 49 U.S.C.A., § 303(a)(10)(11).

As to Part IV of the Interstate Commerce Act, relating to freight forwarders, see the body of the opinion, *infra*.

are unpersuaded that Congress has inadvertently left such a gap in its plan as acceptance of Cornell's argument would create.

"* * * In reporting on the provisions of Part III, the House Committee, a body well acquainted with transportation legislation, made the statement that, 'Most of the regulatory provisions included in the new part III were modeled on provisions of part I dealing with the same subject.' [H.R. Rep. No. 1217, 76th Cong., 1st Sess.] p. 18. At the time of this report, the definition of interstate commerce in Part I upon which that in Part III was modeled had long before been interpreted both by the Commission and the courts as broad enough to cover railroad movements which pass through the territory of two states, even though the freight be carried from a place in one state to another place in the same state. *Missouri Pacific R. Co.* v. *Stroud,* 267 U.S. 404." pp. 638-40.

Note 4 of the opinion, which is followed by the statement that "these decisions have cast grave doubts upon the power of a single state to regulate such movements in whole or in part," is significant. This note reads in pertinent part:

"*Hanley* v. *Kansas City Southern Ry. Co.,* 187 U.S. 617. The rule of the *Hanley* case has not been changed by the cases holding that companies engaged in such transportation movements are subject to taxation by the state where the terminal points are located. See *Cornell Steamboat Co.* v. *Sohmer,* 235 U.S. 549; *Lehigh Valley R. Co.* v. *Pennsylvania,* 145 U.S. 192; *Ewing* v. *Leavenworth,* 226 U.S. 464, 468-469.

"Compare *Wilmington Transportation Co.* v. *Railroad Comm'n,* 236 U.S. 151, 155-156, which held that transportation on the high seas between two points within the state of California, Santa Catalina Island

and San Pedro, being 'local' and not involving 'passage through the territory of another state,' was subject to rate regulation by California in the absence of controlling federal legislation.

"* * *"

Upon consideration of the Senate version of the definition of "transportation in interstate or foreign commerce" in the Transportation Act of 1940, Part III relating to water carriers, which was not retained in the House of Representatives' revision and not enacted as set out in note 8 of the opinion in *Cornell Steamboat Co.*, 321 U.S. at 641, a distinction will be perceived between the Senate version, which read "between places in the same State by a route or routes passing beyond the borders of said State * * *," and the language of the bill as enacted and interpreted by the Court in *Cornell Steamboat Co.* That is, the Senate version would have included in the scope of federal regulation instances of passage over international waters. The bill as enacted and interpreted by the Court included only instances of passage through another state or country as in Part I. As to passage over international waters, under *Wilmington Transp. Co.* there was no absence of state regulatory power and no "gap" in the congressional plan.

While the *Cornell Steamboat Co.* case still was pending before the Interstate Commerce Commission the Congress enacted Part IV of the Interstate Commerce Act, relating to freight forwarders. In this Part IV of the act Congress defined "interstate commerce" to mean:

"* * * transportation (A) between a point in a State and a point in another State, whether or not such transportation takes place wholly within the United States; (B) between points within the same State but through any place outside thereof; or (C) from or to any point in the United States to or from any point

outside thereof * * *." Part IV, § 402(a)(6), 56 Stat. 284, 49 U.S.C.A., § 1002(a)(6).

Upon consideration of the purpose and background of the legislation[20] it is evident that this definition expressed

[20] The regulation of freight forwarders, Part IV of the Interstate Commerce Act, arose out of decisions holding they were not express companies under Part I or regulated by the Motor Carrier Act, Part II. Sen. Rep. No. 132, 77th Cong., 1st Sess., p. 4; H. R. Rep. No. 1172, 77th Cong., 2d Sess., p. 2.

"Freight forwarder" was defined in Part IV as one who utilizes, for the whole or any part of the transportation provided, the services of a carrier subject to Parts I, II, or III. (49 U.S.C.A., § 1002(a)(5)(C)). Part IV did not change the previously existing shipper-carrier relationship between the forwarders and the regulated carriers, *Chicago, Milwaukee, St. Paul & Pacific R.R.* v. *Acme Fast Freight, Inc.*, 336 U.S. 465.

The bill enacted was S. 210, 77th Congress. No hearings were held on S. 210. It was introduced in the 77th Congress "reflecting the conclusions reached as the result of these hearings [hearings held under S. Res. 146, combined with hearings on S. 3665 and S. 3666, 76th Cong., 3d Sess., June, 1940]." Sen. Rep. No. 132, 77th Cong., 1st Sess., p. 2. This S. 210 "constituted the report of the subcommittee [which conducted the above-cited Senate hearings in the 76th Congress]" H. R. Rep. No. 1172 on S. 210, 77th Cong., 1st Sess. It is significant, therefore, that S. 3665 and S. 3666 on which the hearings were held, June, 1940, contained the language "between places in the same State by a route or routes passing beyond the borders of said State," the same language which had been considered in 1939 in connection with S. 2009, 76th Congress, but which was not adopted when the Transportation Act of 1940, Part III, relating to water carriers, was enacted in September, 1940 as reviewed *supra*, p. 26. S. 210, as passed by the Senate, 77th Cong., 1st Sess., provided that the definitions in Parts I, II and III should be used for the purposes of Part IV. S. Rep. No. 132 on S. 210, 77th Cong., 1st Sess., p. 5.

In the House of Representatives, hearings were held in the 76th Congress in 1939 on H. R. 2531 and H. R. 4862, and as a result thereof a provision for freight forwarder regulation was included in the House version of S. 2009. H. R. Rep. No. 1172 on S. 210, 77th Cong., 1st Sess., pp. 4-5. The language "between places in the same State by a route or routes passing beyond the borders of said State" was contained in H. R. 4862 on which the 1939 hearings were held (hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, 76th Cong., 1st Sess., on H. R. 2531 and H. R. 4862, p. 1830) but was not contained in the House revision of S. 2009; it followed the provisions of Part I and in that form was enacted as the Transportation Act of 1940, *supra*, p. 26. The 1940 Act did not include the regulation of freight forwarders.

H. R. 3684 for the regulation of freight forwarders was introduced early in the 77th Congress. Hearings were held on this bill before S. 210 was received from the Senate, and it was the basis for a bill reported as a substitute for S. 210. H. R. Rep. No. 1172 on S. 210, 77th Cong., 1st Sess., p. 5. The House substitute bill, from the time when H. R. 3684 was introduced February 28, 1941, contained the Part IV

the same intent as the corresponding provisions in the other parts of the Interstate Commerce Act set out in note 19, *supra.*

In *Cornell Steamboat Co.* the Supreme Court considered all parts of the Interstate Commerce Act in interpreting Part III, including the newly-enacted Part IV with specific reference to section 402 (a) (6), 49 U.S.C.A.,

definition of "interstate commerce" that finally was enacted, except that the term used was "interstate or foreign commerce" and the language relating to foreign commerce was not the same as was enacted. As explained in the Conference Report, H. R. Rep. No. 2066, 77th Cong., 2d Sess., p. 21, 88 Cong. Rec. 4062, col. 3, the House substitute was not clear in its use of the term "transhipment" in the provision making Part IV applicable to freight forwarding to and from points outside the United States insofar as it took place within the United States. As further explained in the Conference Report: "The definition as agreed to in conference follows the provisions of Part I of the Interstate Commerce Act. The term defined is 'interstate commerce' rather than 'interstate or foreign commerce', but the term is so defined as to include foreign operations by freight forwarders insofar as such freight forwarding 'takes place within the United States'." However, no specific mention was made of other provisions of the definition of interstate commerce, either in the Conference Report or in the House report made when the substitute bill was reported. That report also dwelt only on the foreign commerce aspect. H. R. Rep. No. 1172 on S. 210, 77th Cong., 1st Sess., p. 6. It further stated that: "The bill passed by the Senate, S. 210, and the substitute therefor here reported are substantially similar in general," and then continued "but there are numerous differences, the more important of which are as follows" the subsequent enumeration of differences containing nothing as to the definition of "interstate commerce." *Id.,* p. 21.

It is evident that the provisions of the House substitute here pertinent, which were perpetuated in the Conference Report without specific comment, merely expressed in different language the intent of the Senate version to follow the existing provisions of the Interstate Commerce Act. It would have been futile to have extended the "interstate commerce" definition in Part IV into the area left to the States in Parts I, II and III—clause (C) of the definition of "freight forwarder" (49 U.S.C.A., § 1002 (a) (5) (C) ) would have negatived such extension because no I.C.C. regulated carrier would be utilized. As explained by Senator Wheeler, Committee Chairman, when the Conference Report was considered in the Senate:

"* * * The measure now before us provides for the regulation of freight forwarders along the same general lines that other carriers of freight have been regulated. * * *

"The bill passed the House of Representatives in a form which resulted in certain differences between the House and the Senate. We held conferences for a considerable period of time, and the differences were finally ironed out. * * * On the whole the Congress has followed the line adopted by the Interstate Commerce Commission

§ 1002(a)(6). (321 U.S. at 640-41.)[21] In enacting the Civil Aeronautics Act of 1938 the Congress provided for joint boards to consider matters relating to through service and joint rates, fares or charges of air carriers and common carriers subject to the Interstate Commerce Act, upon reference by the Civil Aeronautics Board or the Interstate Commerce Commission (49 U.S.C.A., § 643).[22] Congress tied the scope of economic regulation to the key words "air transportation" (49 U.S.C.A., § 481), defined (49 U.S.C.A., § 401(10)(21)) in terms resembling the provisions of the Interstate Commerce Act, in contrast with the definition of "air commerce" (49 U.S.C.A., § 401(3)(20)) which was the basis for safety regulations (49 U.S.C.A., § 551) and was much more sweeping, embracing as well "any operation or navigation of aircraft within the limits of any civil airway or any operation or

---

in regulating trucks, busses, railroads, and other common carriers." 88 Cong. Rec. 4021, col. 2.

And as explained by Representative Wolverton, one of the Managers on the part of the House, when the Conference Report was considered in the House:

"As the members would naturally anticipate, the basic pattern of regulation which is proposed for the freight forwarding industry follows along the same general lines as is already embodied in the Interstate Commerce Act in respect to its regulation of carriers by railroad, motor vehicle, and by water. * * *" 88 Cong. Rec. 4065, col. 2.

[21] The Court said:

"Parts I, II, and IV of the Interstate Commerce Act, relating respectively to regulation of rail carriers, motor carriers, and freight forwarders, explicitly or by judicial interpretation cover all shipments which pass through the territory of two or more states even though both terminal points are in the same state. And so if railroads or truckers should use tugs for the same purposes and over the same route as Cornell the movements would be interstate under the Act and subject to regulation by the Commission; and apparently the same is true of freight forwarders. * * *" 321 U.S. at 640-41.

[22] This was the result of the division of authority between the Interstate Commerce Commission and Civil Aeronautics Board, which came about when it was decided in the 75th Cong., 3d Sess., to create a new authority with complete power over aeronautics. See Hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, 75th Cong., 3d Sess., on H. R. 9738, pp. 427-31.

navigation of aircraft which directly affects, or which may endanger safety in interstate, overseas, or foreign air commerce." Similar provisions are contained in the Federal Aviation Act of 1958 (49 U.S.C.A., §§ 1301(4) (10) (20) (21), 1371, 1421, 1483). We are satisfied that all of the economic regulation provisions of title 49 are laws in *pari materia* and should be construed together. *Cf.*, *United States Nav. Co.* v. *Cunard S.S. Co.*, 284 U.S. 474, 480; *Greater Baton Rouge Port Comm'n* v. *United States*, 287 F.2d 86 (5th Cir.) ; *United States* v. *Freeman*, 44 U.S. (3 How.) 556, 564-65; *The Amelia*, 5 U.S. (1 Cranch) 1, 34-35.

But it is contended, in effect, that the words "any place outside thereof" in the Civil Aeronautics Act of 1938 (49 U.S.C.A., § 401(21) (a)) and the Federal Aviation Act of 1958 (49 U.S.C.A., § 1301(21) (a)) have a different meaning from the same words in the Interstate Commerce Act,[23] where "place" means any state or country. In the Interstate Commerce Act the words "any place outside thereof" are preceded by the word "through." In the act here involved the words "any place outside thereof" are preceded by the words "through the airspace over." We have concluded that the words "any place outside thereof" are used in the same way in both acts and have the same meaning. It is significant too that the Federal Bills of Lading Act approved August 29, 1916, 39 Stat. 538, applicable to "bills of lading issued by any common carrier," in terms is limited to instances of passage "through another State or foreign country" when transportation is between points in a single state.

---

[23] Reference here is to Part IV of the Interstate Commerce Act which, as seen, has the same scope as Parts I, II and III. Part I as interpreted covers instances of passage through another state or country. Part II in terms covers instances of passage through another state or country. Under *Cornell Steamboat Co.*, Part III has the same scope as Part I.

Moreover, the argument that in the Civil Aeronautics Act of 1938 and the Federal Aviation Act of 1958 the words "any place outside thereof" signify not only a state or country but also international waters, makes the words "any place" meaningless. This argument gives to the clause "through the airspace over any place outside thereof" the same meaning as if the words "over any place" were not there. Considering a somewhat similar situation Chief Justice Marshall, sitting as a Circuit Justice in *The Adventure,* 1 Fed. Cas. 202 (No. 93) (C.C. Va.), *rev'd on other grounds* 12 U.S. (8 Cranch) 221, in construing a statute which made it unlawful "to import into the United States, or the territories thereof, from any foreign port or place whatever" any products of Great Britain concluded in a case of goods captured on the high seas and brought to an American port that the high seas were not a "foreign port or place," and said in pertinent part:

"* * * This part of the inquiry seems to turn on the meaning of the words 'foreign place,' as they stand in the act of congress. For the goods must be imported from a 'foreign port or place,' to come within the description of the law. The counsel for the claimants take these words in their most enlarged sense, and suppose that any place on land or water, within or without the dominion of any foreign power, is a 'foreign port or place,' within the meaning of the act. It is worthy of remark, that this broad construction refuses to the words under consideration, any operation whatever. Expunge them, and the ambiguity of the sentence is removed. It means all that is required. This will be perceived, by reading the sentence without them, 'Nor shall it be lawful,' &c. If the act was drawn on reflection: if the legislature weighed the words they employed, it must have been perceived, that the words 'from any foreign port or place whatever,' could

have no other operation, than to limit the broad meaning which the sentence without them would necessarily require. They were not wanting to exclude cases of goods, brought from one American port to another, because such an importation is not an importation into the United States. The words in question, then, operate restrictively, or they operate not at all. * * *" 1 Fed. Cas. at 204.

"It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. * * * '[A] statute ought upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *Market Co.* v. *Hoffman,* 101 U.S. 112, 115-16; *Postmaster-General* v. *Early,* 25 U.S. (12 Wheat.) 136, 147-48; *Early* v. *Doe,* 57 U.S. (16 How.) 610, 617; *Eyster* v. *Centennial Board of Finance,* 94 U.S. 500, 503; *Platt* v. *Union Pacific R.R.,* 99 U.S. 48, 58-59; *Ex parte Pub. Nat'l Bank,* 278 U.S. 101, 104; *United States* v. *Menasche,* 348 U.S. 528, 538-39. "* * * [A]ll words of a statute are to be taken into account and given effect if that can be done consistently with the plainly disclosed legislative intent." *McDonald* v. *Thompson,* 305 U.S. 263, 266.

The word "place" denotes a definite locality. As stated in *Lukens Steel Co.* v. *Perkins,* 107 F.2d 627, 631 (D.C. Cir.) :

"* * * In ordinary and common usage *locality* is synonymous in meaning with such words as *place, vicinity, neighborhood* and *community.* These words, also, are too indefinite to be used for purposes of exact measurement in terms of acres or square miles. But neither they nor *locality* itself, in any case, connote large geographical areas, with widely diverse interests, such as the fourteen states and the District of Columbia, grouped in the protested determination. The word

*place,* in its ordinary significance, has a distinctly limited meaning as is indicated by such expressions as place of birth, place of origin, the old home place, ore in place, and by the word placement as used in the game of tennis. * * *"

The word "place" was construed in *Wilmette Park District* v. *Campbell,* 338 U.S. 411, 415-16, to mean "a specific area with definite physical limits." That case concerned the tax on the amount paid "for admission to any place" and the word "place" was construed in that context, but it nevertheless was given the "ordinary and familiar meaning" (338 U.S. at 415).

One of the dictionary definitions of "place" is "a particular region or center of population" (Webster's New International Dictionary, (3d ed.) "place," 3a), and while the last edition of Webster's also has introduced as a definition "an indefinite region or expanse: area" (*id.,* 2a) that meaning robs the words "over any place" of all meaning and moreover is not the definition called for upon consideration of laws in *pari materia.*

Furthermore, other clauses of the section under construction show the sense in which Congress used the term "place." As reasoned in the case of *The Adventure, supra*:

"* * * It may also be noticed, that the same words are used frequently in the same section,—always denoting some place within the dominion of a foreign potentate. In all these cases, the word 'place' is, in terms, limited to some spot within the territory of a foreign nation. This may aid in showing, that the place, in the mind of the legislature, was some place, not in air, or in water, but within the power and jurisdiction of a foreign state, which was capable of being resorted to, for the purposes of commerce. So, subsequently, in the same sentence, the words are used in the same restricted sense." 1 Fed. Cas. at 204.

114

Based on these considerations we conclude that the words "over any place" refer to a place which itself has boundaries, not international waters which are a "no man's land" outside the boundaries of any "place."

It is argued that the statute is phrased as it is, containing the words "over any place," because: "The traditional position has been that the area having sovereignty of the ground beneath also has sovereignty over its airspace, in other words there's no principle of freedom of the air like there is of freedom of the seas as such, so consequently when you're talking of regulatory jurisdiction you fix your jurisdiction in terms of your underlying jurisdiction so to speak."[24] This argument, offered as support for the contention that "through the airspace over any place outside thereof" includes passage over international waters, in our view has the opposite effect. Congress spoke in terms of passage through the airspace of another place, not in terms of passage beyond the State in which is located the places of origin and destination. The language used denotes passage over another place that has jurisdiction of airspace.[25] When passage is over international waters there is no "underlying jurisdiction," *i.e.*, there is no *lex loci*. The law applicable is the law of the vessel, which is considered part of the territory of the country

[24] As stated in *Braniff Airways, Inc.* v. *Nebraska State Board of Equalization & Assessment*, 347 U.S. 590: "These Federal Acts regulating air commerce are bottomed on the commerce power of Congress, not on national ownership of the navigable air space as distinguished from sovereignty. * * *" (347 U.S. at 596). Such exercise of the commerce power is comparable to the federal commerce power over navigable streams by which "the sovereignty of the state is not impaired." (347 U.S. at 597.)

[25] Other provisions of the Civil Aeronautics Act of 1938 and the Federal Aviation Act of 1958 illustrate the terminology used in the acts. Thus "United States" is defined to mean "the several States, the District of Columbia, and the several Territories and possessions of the United States, including the territorial waters and the overlying airspace thereof" (49 U.S.C.A., §§ 401(32), 1301(35)), while in turn the rights of foreign countries are recognized (49 U.S.C.A., §§ 672, 1502). Extension

to which she belongs. *Cf., United States* v. *Rodgers,* 150 U.S. 249, 264; *Lauritzen* v. *Larsen,* 345 U.S. 571, 584; *Wilmington Transp. Co.* v. *Railroad Comm'n, supra,* 236 U.S. at 156; and see the act of June 15, 1950, as amended, 48 U.S.C.A., § 644a, applying the law of the vessel to certain Pacific Islands.

Much reliance is placed on *United Air Lines* v. *Public Util. Comm'n,* 109 F. Supp. 13, in which the District Court stated that air transportation between the mainland of California and Catalina Island in that State was "over a place outside of the State of California." This statement was dictum as noted in our opinion in *In re Island Airlines,* 44 Haw. 634, 640, 361 P.2d 390, 394, for the judgment was reversed on the ground that the trial court should not have entertained the case, *Public Util. Comm'n* v. *United Air Lines, Inc.,* 346 U.S. 402.[26] Moreover, we do not find the opinion of the District Court persuasive.

It is contended that the legislative history and administrative practice confirm the conclusion that Congress meant to pre-empt economic regulation of air carriers whose routes between points in a single state pass over the high seas. In support of this contention three arguments are made.

1. Reliance is placed on a letter of July 31, 1935 from

---

of the application of the Federal Aviation Act of 1958 to "any areas of land or water outside of the United States and the overlying airspace thereof" depends upon "the necessary legal authority to take such action" under "international treaty, agreement or other lawful arrangement * * *." (49 U.S.C.A., § 1510).

On the other hand, when it is intended to speak not of jurisdiction over particular airspace but instead of absence of jurisdiction thereover, the traditional language "out of the jurisdiction of any particular State" is used. (49 U.S.C.A. § 1473(a); compare 18 U.S.C.A., § 7(1) and (5)).

[26] It is to be noted that this case disposes of Hawaiian Airlines' contention that any assertion of State jurisdiction should be deferred in favor of "primary jurisdiction" of the Civil Aeronautics Board. The doctrine of "primary jurisdiction" calls for the procedure here followed.

116

Joseph B. Eastman, Federal Coordinator of Transportation, to Senator Wheeler, Chairman of the Committee on Interstate Commerce, commenting on S. 3027, 74th Cong., 1st Sess. Hearings before a Subcommittee on Interstate Commerce, United States Senate, 74th Cong., 1st Sess., on S. 3027, p. 68. Included in this letter was the following: "* * * It is suggested * * * that after the word 'through' in line 18 there be substituted for the words 'another State' the words 'the air space over any place outside thereof,'. The latter change would include as interstate commerce, transportation between points in the same State over a foreign country or the high seas as well as over another State. There is the same need for regulation in the one case as in the other."

It will be noted at once that the writer of the letter was in error in stating: "There is the same need for regulation[27] in the one case as in the other." This is plain upon comparison of *Hanley* v. *Kansas City So. Ry.*, 187 U.S. 617, with *Wilmington Transp. Co.* v. *Railroad Comm'n*, 236 U.S. 151, 155-56, as set out in note 4 of *Cornell Steamboat Co.*, 321 U.S. 634, 639, quoted *supra*. In the case of transportation between points in the same state over the high seas: "The sovereignty of no other jurisdiction is encountered." *Wilmington Transp. Co.* v. *Railroad Comm'n, supra,* 236 U.S. 151, 156.

While the letter perhaps is relevant though the subject matter was an earlier bill in the 74th Congress,[28] not the

---

27 As shown by other parts of the cited letter, the writer was commenting upon the need of economic regulation.

28 See *Transcontinental & Western Air Lines, Inc.* v. *Civil Aeronautics Board*, 336 U.S. 601, 605, n. 6, referring to hearings in the 75th Congress on the 1937 bill, which was not enacted. Here the 1935 letter, commenting on a bill in the 74th Congress, was placed in the Senate record of hearings on the 1935 bill, and that record was reprinted as an appendix to the 1937 Senate hearings. Hearings before a Subcommittee of the Committee on Interstate Commerce, United States Senate, 75th Cong., 1st Sess., on S. 2 and S. 1760, Pt. II, p. 601 *et seq.*

However, in the hearings in the Senate on the 1937 bill, Mr. Eastman,

one which was enacted, we find it of little weight. *Cf.,* *Commissioner* v. *Acker,* 361 U.S. 87, 93. In construing legislation the Supreme Court "has disfavored inroads by implication on state authority and resolutely confined restrictions upon the traditional power of states to regulate their transportation to the plain mandate of Congress." *Palmer* v. *Massachusetts, supra,* 308 U.S. 79, 84.

2. It is contended by the Civil Aeronautics Board, *amicus curiae,* that "the Board interpreted the Civil Aeronautics Act from its inception as being applicable to transportation between places in the same state where the transportation involved passage over the high seas" citing *Wilmington Catalina Airline, Ltd.,* 1 C.A.A. 431 (1939). This was the foundation of the *United Airlines* case, *supra.* The case never has come to a final decision. The argument is in effect that because there was air service to Catalina Island when the Civil Aeronautics Act was en-

---

reporting on March 2, 1937 on S. 2, 75th Cong., 1st Sess., stated that:

"S. 2 provides for comprehensive regulation in the public interest of air transportation in interstate commerce, similar in scope to parts I and II of the Interstate Commerce Act, governing, respectively, the regulation of railway and highway carriers." *Id.,* Pt. I, p. 41.

In the House of Representatives, Mr. Eastman, reporting on March 29, 1937 on H. R. 5234, 75th Cong., 1st Sess., another 1937 bill, stated that:

"H. R. 5234 provides comprehensive regulation in the public interest of air transportation in 'interstate', 'overseas', and 'foreign' commerce, similar in scope to parts I and II of the Interstate Commerce Act, governing, respectively, the regulation of railway and highway carriers.

\*　　　　\*　　　　\*　　　　\*

"H. R. 5234 generally follows the pattern of parts I and II of the Interstate Commerce Act, but there are certain matters upon which comment is desirable.

"H. R. 5234 would extend the Commission's jurisdiction to air carriers operating in 'foreign commerce', in addition to such carriers engaged in the transportation of passengers and property within the continental United States (interstate commerce) and to and from and between the Territories and possessions of the United States (overseas commerce). \* \* \*" Hearing before the Committee on Interstate and Foreign Commerce, House of Representatives, 75th Cong., 1st Sess., on H. R. 5234 and H. R. 4652, pp. 15, 18.

We have not been cited to any printing of the 1935 letter in the House hearings.

acted, and a grandfather certificate was granted upon application to the C.A.A.,[29] this established a "consistent and generally unchallenged" administrative practice within the meaning of *Norwegian Nitrogen Prods. Co.* v. *United States*, 288 U.S. 294, 315, cited by the C.A.B. in support of its contention. According to this line of reasoning, when California asserted jurisdiction over the Catalina service in 1951,[30] following 1950 proceedings which established Public Utilities Commission jurisdiction over intrastate rates of air carriers,[31] the issue already was foreclosed by the ex parte 1939 grandfather proceeding. But an administrative ruling cannot attain the status of having been "consistent and generally unchallenged" when there has been no one to challenge it. *Cf., Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 290. The Catalina service has been the single instance[32] in which

---

[29] It is interesting to note that under the Air Commerce Act of 1926 the Catalina carrier had encountered "an uncertainty as to the status of the company as an interstate carrier" on the part of the Bureau of Air Commerce, which administered that act. 1 C.A.A. at 433. The Air Commerce Act of 1926, 44 Stat. 568, though very limited in its provisions, contained in the definition of "interstate or foreign air commerce" the clause "between points within the same State * * * but through the airspace over any place outside thereof; * * *"

[30] *United Air Lines, Inc.* v. *Public Util. Comm'n, supra,* 109 F. Supp. 13, *rev'd on the ground the case should not have been entertained,* 346 U.S. 402.

[31] *Re California Central Airlines,* 85 P.U.R. (n.s.) 523; *Re California Central Airlines,* 50 Cal. P.U.C. 563, April 24, 1951, Decision No. 45624, *appeal dism'd for want of a substantial federal question,* 342 U.S. 908; *People* v. *Western Air Lines,* 42 Cal. 2d 621, 268 P.2d 723, *appeal dism'd for want of a substantial federal question,* 348 U.S. 859.

[32] Upon the argument counsel for C.A.B. informed the court that: "The only other place in which it would be a feasible operation I think might be off Massachusetts * * * but there has never been any problem to my knowledge. There have been some operations up there but those have been air taxi operations which have been under exemption of authority." See also note 14.

It is to be noted that when Hawaii was a territory other language of the Civil Aeronautics Act of 1938 and Federal Aviation Act of 1958, *i.e.,* "between places in the same Territory" (49 U.S.C.A., § 401(21)(a); *id.,* § 1301(21)(a)), conferred jurisdiction on the C.A.B. and the point here involved was not in issue.

the point here involved has been in issue. We find no such "uniform and consistent"[33] or "consistent and generally unchallenged"[34] administrative practice as to persuade us that C.A.B.'s contention is well taken. *Cf., Civil Aeronautics Board* v. *Delta Air Lines,* 367 U.S. 316, 332.

Moreover, the Conference Report on S. 3880, which became the Federal Aviation Act of 1958, made it plain that:

"'* * * the Congress does not intend that this reenactment of portions of the Civil Aeronautics Act of 1938 shall constitute legislative adoption of administrative interpretations and practices or of judicial decisions under that act.

"'* * * the reenactment of provisions now in effect is to be regarded as a completely neutral factor * * *." Conf. Rep. No. 2556, 85th Cong., 2d Sess., 2 U.S. Code & Adm. News 3766, 3771-72.

3. Great reliance is placed on S. Rep. No. 80, 86th Cong., 1st Sess., March 5, 1959, accompanying S. 50, which was enacted as Public Law 86-3, the Admission Act. In this report there was a section on "Aviation Matters." There can be no doubt that the Committee considered the language "transportation between places in the same State through the airspace over any place outside thereof" synonymous with "transportation through airspace outside the State." The Committee said:

"'* * * Under the provisions of the Federal Aviation Act of 1958 and other applicable Federal legislation, the Civil Aeronautics Board exercises economic regulatory jurisdiction over carriers engaged in interstate air transportation, which is defined to include not only

---

[33] *Burnet* v. *Chicago Portrait Co.,* 285 U.S. 1, 16.

[34] *Norwegian Nitrogen Prods. Co.* v. *United States, supra,* 288 U.S. 294, 315.

transportation between a place in a State and a place in any other State, but also transportation between places in the same State through the airspace over any place outside thereof. Consequently, with the admission of Hawaii as a State, interisland air transportation will remain subject to the economic controls provided by the Federal Aviation Act including other applicable Federal legislation, because that transportation, or most of it, while between places in the same State, will pass through airspace outside the State. * * *" S. Rep. No. 80, 86th Cong., 1st Sess., p. 4.

We have considered what weight should be given to this construction of the Federal Aviation Act of 1958.

The legislative record shows that the source of this construction was the government departments appearing before the subcommittee. They gave the Federal Aviation Act of 1958 the same reading as if the words "over any place" were not there. For example, the C.A.B. general counsel testified on February 25, 1959, shortly before the committee brought in its report:

"To the extent that the channels and waters between the islands comprising the land area of the State of Hawaii are not defined or considered to be a part of the State of Hawaii, the Board would also continue to exercise regulatory jurisdiction over air transportation between the islands by virtue of the definition of interstate air transportation, since the carrier would be traveling between points within the same State, but through the airspace outside thereof.

        *         *         *         *

"Transportation by air which originates and terminates on the same island and does not involve flight through airspace outside the State or carriage of traffic moving in interstate or foreign commerce would be under the jurisdiction of the State of Hawaii. * * *"

Hearing before a Subcommittee on Territories and Insular Affairs, United States Senate, 86th Cong., 1st Sess., on S. 50, p. 54.

After raising a question as to the extent of the boundaries, counsel continued:

"Whether the Board is to continue to exercise regulatory control of transportation between the islands is a question to be decided by the Congress. This question can be resolved either by clarifying or amending the Statehood Act, to specify the status of the waters between the islands either generally or for purposes of transportation jurisdiction or by appropriate amendment to the Federal Aviation Act.

"The latter course would have the advantage of permitting the Congress to focus on the particular problem, divorced from the broader considerations pertaining to the admission of Hawaii as a State." *Id.,* p. 55.

It was in response thereto that the section on "Aviation Matters" was included in the committee report.

Not only was there an absence of any discussion at the hearing as to the meaning of the Federal Aviation Act of 1958 but also there was confusion as to the State's power if exempted from C.A.B. control, as appears from the following:

"Senator JACKSON. Will you refresh me on my constitutional law now. If we exempted Hawaii from CAB control but still treated the waters as international between the islands—the State could not pass any legislation?

"Mr. STONE [C.A.B. general counsel]. That is correct, sir.

"Senator JACKSON. That is my recollection. The State cannot attempt to regulate interstate commerce. They can within their own area handle such matters

as the sale of liquor on vehicles moving, but they could not occupy the field completely; could they?

"Mr. STONE. That is right.

"Mr. STEVENS [Assistant to the Secretary of the Interior]. I don't want to get into a debate over that, but I think that in the absence of conflicting legislation if the Federal Government declined to regulate as to strictly interisland commerce, commerce which was not going from one State to another but from one point in Hawaii to another point in Hawaii, Hawaii could regulate it.

"Senator JACKSON. But what if it passed through international waters?

"Mr. STEVENS. Even if it could pass through international waters.

"Mr. STONE. I don't see how it could do that without amending the Federal Aviation Act.

"Mr. STEVENS. This is not talking to his specific act. The Federal Aviation Act is not a condition but a theory.

"Senator JACKSON. My hypothetical situation is —suppose that by amendment this bill took away the present authority of the CAB to regulate in Hawaii —they have that authority now—and section 15 did not apply, my point is that it would not be legally possible for the new State legislature to regulate air commerce between the islands where international airspace or international waters were involved; isn't that right?

"Mr. STONE. That is correct. Under the definition of interstate air transportation under the Federal Aviation Act of 1958 we say—

"Interstate transportation, air transportation is defined in relevant part and part (b) between places in the same State through the airspace over

any place outside thereof or between places in the same territory of United States." *Id., p.* 61.

The rule is that the legislative history of an act may be examined in ascertaining the intention of Congress in that act, but interpretation by members of Congress of an earlier act during consideration of the later act before them is not of weight for the purpose of construing the earlier act. *United States* v. *Wise,* 370 U.S. 405, 414; *United States* v. *United Mine Workers of America,* 330 U.S. 258, 281-82. There was not, in the Admission Act, any amendment or declaration of the meaning of the Federal Aviation Act of 1958 or a law in *pari materia,* except in respect of the guaranty provision hereinafter noted. Distinguishable, therefore, are *Federal Housing Adm.* v. *The Darlington, Inc.,* 358 U.S. 84; *United States* v. *E. I. Du Pont De Nemours & Co.,* 353 U.S. 586; *Rainwater* v. *United States,* 356 U.S. 590; *Levindale Lead & Zinc Mining Co.* v. *Coleman,* 241 U.S. 432; *cf., Penn Mutual Life Ins. Co.* v. *Lederer,* 252 U.S. 523, 538.

It is argued that this is not a case of "post legislative history" but instead a case of "contemporaneous legislation"—the Admission Act—passed with an "understanding of a certain effect." However, it is entirely clear under *United States* v. *Wise, supra,* that the committee report is of consequence only in construing the Admission Act itself, and the effect, if any, on the already enacted Federal Aviation Act of 1958 must come from the provisions of the Admission Act, construed with the usual aids. Absent any provision of the Admission Act on which the committee report could operate, it did not serve as a construction of the Federal Aviation Act of 1958 any more than individual expressions of opinion on the floor of the Senate would have so served. Moreover, the report was not made by the Committee on Interstate and Foreign Commerce which reported the Federal Aviation Act of 1958. *Cf.,*

*Sioux Tribe of Indians* v. *United States,* 316 U.S. 317, 329; *United States* v. *United Mine Workers of America, supra,* 330 U.S. at 282. No member of the Interior and Insular Affairs Committee was a member of the Senate committee that reported the Civil Aeronautics Act of 1938, and only one, Senator Bible of Nevada, was a member of the Senate committee that reported the Federal Aviation Act of 1958. Senator Bible, however, was not a member of the subcommittee which held the above-cited hearing on the Admission Act.

The provisions of the Admission Act itself show that the Congress was in some doubt as to the effect of the admission of the State on C.A.B. jurisdiction. By the act of September 7, 1957, Public Law 85-307, 71 Stat. 629, Congress had provided for federal guarantee of aircraft purchase loans to:

"* * * any air carrier holding a certificate of public convenience and necessity issued by the [Civil Aeronautics] Board (a) designated therein to be for local or feeder air service, or (b) providing for operations wholly within the Territory of Hawaii * * *."

At that time, the Civil Aeronautics Act of 1938 conferred C.A.B. jurisdiction over "carriage by aircraft * * * between places in the same Territory" (49 U.S.C.A., § 401 (21) (a) ).

During his appearance before the Senate Subcommittee on Territories and Insular Affairs on February 25, 1959 the C.A.B. general counsel called the committee's attention to Public Law 85-307, stating:

"* * * While in our opinion the loan guarantee law would remain applicable after Hawaii becomes a State, the committee may nevertheless wish to include a specific provision in the bill continuing the applicability of Public Law 85-307 to carriers operating within the 'State of Hawaii.' " Hearing before Subcommittee

on Territories and Insular Affairs, United States Senate, 86th Cong., 1st Sess., on S. 50, p. 56.

Such a provision was contained in section 21 of the Admission Act, Public Law 86-3, substituting the words "State of Hawaii" for "Territory of Hawaii."

Here the "Aviation Matters" section of the cited committee report ties in with a provision of the Admission Act, and the committee report is relevant to that provision, section 21, Public Law 86-3. The committee report dispels any notion that by this amendment Congress manifested a view that the existing Hawaiian air carriers were operating wholly within the boundaries of the State. In any event, Public Law 85-307 was not written in terms of boundaries but instead in terms of service rendered. *Pacific Express Co.* v. *Seibert,* 142 U.S. 339, 350, followed in *McCaw & Keating* v. *Tax Comm'r,* 40 Haw. 121, 175, *aff'd,* 216 F.2d 700 (9th Cir.).

While we do not find convincing the argument based on the amendment made of Public Law 85-307 we likewise do not find convincing the argument based on the administrative practice and the legislative history of the Federal Aviation Act of 1958. It is our conclusion that in the Civil Aeronautics Act of 1938 and the Federal Aviation Act of 1958 Congress did not depart from its historic policy. As in the laws in *pari materia* it left under state control the regulation of rates for transportation between points in a single state, even if over international waters.

We have reached no conclusion as to whether applicant's flights will or will not stay within the State's boundaries. The Federal Aviation Act of 1958 does not speak merely of passage through the airspace outside the State. The flights will not traverse the airspace of any other jurisdiction, foreign or domestic, and accordingly the limiting words "over any place" are not satisfied.

*Richard K. Sharpless (Lewis, Buck & Saunders* of

counsel) for intervenor-appellant Hawaiian Airlines, Inc.

*Herbert Y. C. Choy* (*Fong, Miho, Choy & Robinson* of counsel) for intervenor-appellant Aloha Airlines, Inc.

*Frank D. Padgett* (*Robertson, Castle & Anthony* of counsel) for applicant-appellee Island Airlines, Inc.

*Arthur S. K. Fong,* Deputy Attorney General (*Bert T. Kobayashi,* Attorney General, with him on the briefs), for Public Utilities Commission, appellee.

*O. D. Ozment,* Associate General Counsel, (*Lee Loevinger,* Assistant Attorney General, *Richard A. Solomon,* Attorney, Department of Justice, *John H. Wanner,* General Counsel, *Joseph B. Goldman,* Deputy General Counsel, *Arthur R. Schor* and *William F. Becker,* Attorneys, with him on the brief) for Civil Aeronautics Board, *amicus curiae.*

DISSENTING OPINION OF TSUKIYAMA, C. J.

Involved in this case is the paramount issue of whether the Public Utilities Commission of the State of Hawaii has the authority to entertain economic regulatory jurisdiction over interisland air transportation of persons or property vis-a-vis the Federal Civil Aeronautics Board. The question of jurisdiction has been squarely presented to this court as a result of the Commission's decision in the affirmative.

In 1962, the legislature of the State of Hawaii passed an amendatory legislation providing, *inter alia,* that no common carrier shall engage in transportation by aircraft without securing a certificate of public convenience and necessity issued by the Public Utilities Commission, which provision to take effect upon final determination by the courts that the Commission has jurisdiction to regulate air carriers operating between the eight major islands of the State (Act 25, Regular Session, 1962).

In resolving the jurisdictional controversy between the

Public Utilities Commission and the Civil Aeronautics Board, there loom before this court two acts of the Congress, to wit, the Hawaii Statehood Act, commonly referred to as the Hawaii Admission Act (P. L. 86-3, 86th Congress), and the Federal Aviation Act of 1958 (72 Stat. 737, 49 U.S.C. § 1301 *et seq.*). To reach a correct interpretation of the pertinent provisions thereof, their legislative history as shown by the record as well as the geographical characteristics of the islands which comprise the State of Hawaii must perforce be carefully examined and considered.

Section 2 of the Hawaii Statehood Act provides: "The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act [March 18, 1959], except the atoll known as Palmyra Island, together with its appurtenant reefs and territorial waters, * * *." (P. L. 86-3, § 2, 73 Stat. 4.)

Section 1301(21)(a) of the Federal Aviation Act of 1958 reads: " 'Interstate air transportation' * * * means the carriage by aircraft of persons or property as a common carrier for compensation or hire * * * in commerce between, respectively—(a) A place in any State of the United States, * * * and a place in any other State of the United States; or between places in the same State of the United States through the airspace over any place outside thereof; * * *." Section 401(a) of the same Act (49 U.S.C. § 1371(a)) further reads: "No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board [Civil Aeronautics] authorizing such air carrier to engage in such transportation."

The above-quoted language of the Hawaii Statehood Act initially raises the inquiry as to the meaning of the phrase "their appurtenant reefs and territorial waters, included in the Territory of Hawaii [on March 18, 1959]."

The plethora of historical material relative to the manner in which the Hawaiian monarchy allegedly regarded or treated the channel waters between the islands, while academically enlightening, does not appear to serve as a practical aid to the ascertainment of the legislative intent of the Congress. In connection with the annexation of the Hawaiian Islands to the United States in 1898, the Republic of Hawaii ceded all rights of sovereignty in the "Hawaiian Islands and their dependencies." The United States, under the Joint Resolution of the Congress, known as the Newlands Resolution (30 Stat. 750), accepted the cession of the "Hawaiian Islands and their dependencies." It was then historically known that the Hawaiian government had always claimed ownership as a part of the archipelago the small islands, shoals and atolls within a radius of approximately 1000 miles to the northwest and southwest of the main islands of Hawaii. It is reasonable to assume that the term "dependencies" referred only to those remote areas. It is notable that neither the Republic of Hawaii nor the Congress in their respective annexation acts directly or indirectly alluded to the channel waters between the inhabited main islands of the Hawaiian group.

Though strongly urged by the Commission and the Island Airlines, appellees, I am unable to concur in the contention that their position with reference to Hawaii's claim of jurisdiction over the channel waters is sustained by the acts of the monarchy and the decisional law of Hawaii. It is undisputed that the deep ocean waters between the islands which extend far beyond the three-mile limit are a part of the high seas. Accordingly, the voluminous record anent the various routes of flight by Island Airlines designated as "Pineapple," "Hibiscus," "Grass Shack," "Hula Girl," and "Orchid," has no relevancy in the determination of the instant jurisdictional controversy. It suffices that the air carrier does fly from one

island to another over the high seas. If, as this court now rules, the contention is that the airspace traversed by the carrier is not subject to any other dominion or sovereignty, it should be of no consequence whether the flights are as the crow flies or there are occasional deviations from the airways under the visual flight or instrument flight rules.

The Second Act of Kamehameha III (Statute Laws of 1846, Vol. I, Chap. VI, P. 83), *The King* v. *Parish,* 1 Haw. 36 (original print) (58 second print) (1849), *Bishop* v. *Mahiko,* 35 Haw. 608 (1940), to which appellees assign great prominence, all enunciated in consonance with the universal law of nations that the territorial jurisdiction of the Hawaiian Islands extended seaward to a distance of one marine league or three miles. Beyond this three-mile limit, the waters are universally recognized and honored as international waters or high seas. In accord is *In re Investigation of Inter-Island Steam Navigation Co.,* 24 Haw. 136 (1917) in which this court held that under the Shipping Act of 1916, as it then read, the company's vessels plying between the islands were engaged in the transportation of passengers and property "on the high seas" and therefore subject to the jurisdiction of the United States Shipping Board and not the Public Utilities Commission.

The Second Act of Kamehameha III contained, in its pertinent part, the following: "The Jurisdiction of the Hawaiian Islands shall extend and be exclusive for the distance of one marine league seaward, surrounding each of the islands of Hawaii, Maui, Kahoolawe, Lanai, Molokai, Oahu, Kauai and Niihau; commencing at low water mark on each of the respective coasts of said islands. The marine jurisdiction of the Hawaiian Islands shall also be exclusive in all the channels passing between the respective islands, and dividing them; which jurisdiction shall extend from island to island." In the light of the

positive jurisdictional declaration set forth in the first sentence, it is obvious that the term "marine jurisdiction" used in the second sentence was intended to refer to fisheries, registration and control of surface vessels plying between the islands in coasting trade, and to the exercise of local authority for the protection of the coast and the inhabitants. In any event, the foregoing statute was expressly repealed. (Civil Code of 1859, Chap. XL, § 1491.)

From the inception of its judicial history, this court has consistently recognized the law of nations governing the international status of the high seas. In *The King* v. *Parish*, 1 Haw. 36 (1849), the court upheld the jurisdiction of the Hawaiian authorities over an offense committed on an American vessel lying within the three-mile marginal sea. Chief Justice William L. Lee said: "That it was the unshaken doctrine of the law of nations, that the maritime territory of every state extends to the ports, harbors, bays, mouths of rivers, adjacent parts of the sea enclosed by headlands, belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or so far as a cannon shot will reach from the shore, along all the coasts of the state. * * * That the legislature of this Kingdom in claiming a jurisdiction over the seas surrounding our coasts to the distance of one marine league, had done no more than simply declare the universal law of nations."

The case of *Bishop* v. *Mahiko*, 35 Haw. 608 (1940), is repeatedly cited by appellees in respect to a dictum therein (at page 643) which, it is claimed, indicated the court's recognition of the "intervening and surrounding waters" as a part of Hawaii. The issue in that case involved the determination of the title to fishery appurtenant to the area of Makalawena. The court, however, referred to and quoted from *Carter* v. *Territory of Hawaii*, 14 Haw. 465, and Gould on Waters and clearly showed

that the coverage of the term "waters" was known to be limited to the area lying within a distance of one marine league.

Significant is the observation that in *Bishop* v. *Mahiko, supra,* the term "territorial waters" appears in the court's quotation from Gould on Waters, to wit: "By the modern law of nations, the territorial waters extend only to such distance as is capable of command from the shore, or the presumed range of cannon, which, for the purpose of certainty, is regarded as one marine league * * *." Indeed, that term has been used synonymously and interchangeably with "territorial sea," "intervening waters," "marginal sea," and "marine belt." Webster's New International Dictionary, Second Edition, p. 2607, defines "territorial waters" as "The waters under the territorial jurisdiction of a state including (1) its marginal sea (called also marine belt or territorial sea), that part within three miles of its shore as measured from mean or low water mark * * *." In III Cyclopaedia of Political Science Political Economy and United States History, p. 910, we find the following definition: "Territorial waters are all waters within the jurisdictional limits set by international law to an independent state. Such waters comprise * * * 2, uninclosed waters, or the open sea to a distance of one marine league * * *." Again, in Ballantine Law Dictionary with Pronunciations, Second Edition, p. 1281: "The territorial waters of a state on the sea coast are often so designated since they include a strip three nautical miles wide off shore * * *." In III Cylopedia of American Government, p. 536: "Three-Mile-Limit. This is a phrase used to denote the extent of a state's jurisdiction over the open sea. The marginal sea with the shore-bottom under it for a distance of at least three marine miles beyond low-water mark is recognized as a part of the territory of the adjacent state * * *." 18

Collier's Encyclopedia, p. 552 (1955) : "Three-mile limit, the jurisdiction of a coastal state extending to the open sea a distance of three miles measured from low tide. In international law it is often called the marginal sea. * * * It is generally agreed that the three-mile limit includes the air above the waters as well as the bed of the sea and its subsoil." 1 Schwarzenberger, A Manual of International Law, p. 120: "Islands have their own territorial seas." See also, 17 The World Book Encyclopedia, *Territorial Waters*, p. 140; Jessup, The Law of Territorial Waters and Maritime Jurisdiction (1927), p. 53.

It is argued that the Constitutional Convention of 1950 regarded the channel waters between the islands of the Territory of Hawaii as a part of the territorial waters. (Standing Com. Rep. 56, p. 208.) In the light of the decisional law of the Territory and the time-honored position taken by the United States in respect to the international status of the high seas, the statement of the standing committee fails to carry a serious import.

Historically the United States has consistently not only recognized but insisted that an area extending three miles into the sea from the shoreline is the limit of territorial waters. Executive determinations, declarations and statements have never been known to deviate from that international rule. 32 Department of State Bulletin, p. 934 (1955); 40 Department of State Bulletin, p. 963 (1959); III United Nations Conference on the Law of the Sea (Official Records), p. 25 (1958); 1 Hyde, Internatonal Law Chiefly as Interpreted and Applied by the United States, p. 254. The following statement of United States Representative Dean, set forth in III United Nations Conference, *supra,* is significant: "The Committee should bear in mind that whatever was added to an individual State's Territorial waters must inevitably be substracted from the high seas, the common property of

all nations. For example, if islands were treated as an archipelago and a twelve-mile belt was drawn around the entire archipelago according to the straight baseline system, then areas of the high seas formerly used by ships of all countries would be unilaterally claimed as territorial waters or possibly even internal waters. It would be a misnomer to describe such restrictions on the free use of the high seas as 'progressive' measures."

During the hearings on Statehood for Hawaii in the 83rd Congress, the State Department expressed its position on the three-mile rule in a letter to Senator Hugh Butler, Chairman of the Senate Committee on Interior and Insular Affairs, dated January 20, 1954, which in part said: "* * * the traditional position of this Government from the time of Jefferson has been in favor of the so-called 3-mile limit as the breadth of Territorial waters, and the maintenance of this traditional position of the United States is considered vital * * *. It is the Department's view, therefore, that limitation of the new State's boundaries to 3 miles from the coast would not only be consistent with the interests of this Government in its relations with other foreign states, but also with its own concepts of defense." (Senate Rep. 886 on S. 49, 83rd Cong., 2nd Sess., p. 40.)

It is also to be noted that the Congress has expressly made applicable to the State of Hawaii the three-mile limit set forth in the Submerged Lands Act. Section 2 of said Act (67 Stat. 29) provides: "* * * in no event shall the term 'boundaries' * * * be interpreted as extending from the coast line more than three geographical miles into the * * * Pacific Ocean, * * *." Section 5(i) of the Hawaii Statehood Act reads: "The Submerged Lands Act of 1953 * * * and the Outer Continental Shelf Act of 1953 * * * shall be applicable to the State of Hawaii, and

the said State shall have the same rights as do existing States thereunder."

The courts of the nation have on numerous occasions made judicial enunciations on the three-mile doctrine. Said the court in *Cunard Steamship Co.* v. *Mellon,* 262 U.S. 100 at 122 (1923) : "It is now settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea along its coast and a marginal belt of the sea extending from the coastline outward a marine league or three geographic miles."

An interesting California case, *In re Marincovich,* 48 Cal. App. 474, 479, 192 Pac. 156, 157 (1920), held that the three-mile rule applied to the state because its organic law did not expressly exclude the waters from its territory and jurisdiction. Significantly, the court there said that California acquired "on her admission into the union, the sovereignty of an independent nation over a zone of waters three miles wide extending along the mainland, and also over similar zones or belts *around the islands along and adjacent to her coast* * * *."* (Emphasis supplied)

Firmly recognized and accepted is the principle that international law constitutes a part of the law of the nation and as such must be administered by its judiciary and conformed to by the executive and legislative branches. *The Paquete Habana,* 175 U.S. 677, 700; *Banco Nacional De Cuba* v. *Sabbatino,* 307 F.2d 845, 860. Said the court in the latter case: "* * * the very proposition that something known as international law exists carries with it the implication that national sovereignty is not absolute but is limited, where the international law impinges, by the dictates of the international law." Moreover, in *Lauritzen* v. *Larsen,* 345 U.S. 571, 578 (1953), the court

adopted the "long-heeded admonition of Mr. Chief Justice Marshall that 'an act of congress ought never to be construed to violate the law of nations if any other possible construction remains * * *.' "

On November 7, 1950, in anticipation of statehood the people of Hawaii had ratified a Constitution. Article XIII, Section 1, thereof established the boundaries of the State as follows: "Section 1. The State of Hawaii shall include the islands and territorial waters heretofore constituting the Territory of Hawaii." In enacting the Hawaii Statehood Act, approved March 18, 1959, the 86th Congress described the boundaries of the State as in part quoted earlier in this opinion (P. L. 86-3, Section 2), to wit: "The State of Hawaii shall consist of all the islands together with *their* appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act, * * *." (Emphasis supplied) As required by Section 7(b) of said Act, the boundary description was submitted to the people who voted in favor of the same on June 27, 1959. Of significance is the fact that, in conjunction with the adoption of the description, the people, as further required by said Section 7(b), also voted in favor of the additional stipulation "* * * and all claims of this State to any areas of land or sea outside the boundaries so described are hereby irrevocably relinquished to the United States."

In the light of the cumulus of authorities defining "territorial waters" and the limited extent of the off-shore area embraced by them, it is indubitable that the Congress used those words fully advised as to their universally accepted meaning. *A fortiori*, the pronoun "their" which modifies the word "islands" appears to have been deliberately employed to leave no doubt that territorial waters meant the waters surrounding *each island*. It is all too patent that the Congress, with knowledge that miles of

international waters intervene between the main islands, intentionally avoided the use of any language in its legislation susceptible of the construction that the United States government or the State of Hawaii claimed jurisdiction over the high seas to the exclusion of other nations.

I cannot more fully agree with the court's statement in its opinion in the case at bar quoting, with approval, the cannon of statutory construction that "significance and effect shall, if possible, be accorded to every word * * * 'a statute ought upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' "

I now reach the point which requires an examination of the Federal Aviation Act under which the Civil Aeronautics Board exists and derives its powers and the ascertainment of the intent and purpose of the Congress in employing the phrase "places in the same State of the United States through the airspace over any place outside thereof." (49 U.S.C. § 1301(21)(a).)

It has been argued that insofar as the State of Hawaii is concerned, the word "place" does not or was not intended to cover the channel waters intervening between the islands. As seen above, it is my view that the ocean channels intervening between the main islands and covering distances extending miles and miles beyond the three-mile belt of each island have always been and are still deemed to be high seas or international waters. This unique geographical feature of the Hawaiian Islands was under discussion and consideration by the Congress in connection with its legislation on Statehood for Hawaii.

In reviewing the legislative history in interstate air commerce, it is observed that, when the first comprehensive bill on the subject was under consideration (S. 3027, 74th Cong., 1st Sess., 1935), the Federal Coordinator of Transportation, Mr. Joseph Eastman, suggested a certain

language change in the bill particularly in respect to the definition of interstate commerce which then read "commerce * * * between places in the same State through another State * * *." The suggestion, set forth in his letter of July 31, 1935 (Hearings of Subcommittee on Interstate Commerce, U. S. Senate, 74th Cong., 1st Sess., on S. 3027, p. 68), was *in haec verba*: "* * * that after the word 'through' in line 18 there be substituted for the words 'another state,' the words 'the air space over any place outside thereof.' The latter change would include as interstate commerce, transportation between points in the same State over a foreign country or *the high seas* as well as over another State." (Emphasis supplied)

Significantly, in the 75th Congress which followed, Mr. Eastman's full letter of July 31, 1935, which had been made part of the record by Senator Harry S. Truman, then Chairman of the Subcommittee of the Senate Committee on Interstate Commerce, along with the entire record of the hearings on S. 3027, were included in the appendix of the April 1937 hearings on S. 2—A bill to amend the Interstate Commerce Act, as amended, by providing for the regulation of the transportation of passengers and property by aircraft in Interstate Commerce. (Appendix, Hearings, Subcommittee of Senate Committee on Interstate Commerce, April 1937, 75th Cong., 1st Sess., p. 673.)

The change thus suggested was adopted and the revised language incorporated in all subsequent measures, such as the Civil Aeronautics Act of 1938 (52 Stat. 973, 49 U.S.C. § 401(21)(a) and Federal Aviation Act of 1958 (72 Stat. 731, 49 U.S.C. § 1301(21)(a)).

During the 83rd Congress, First Session, extensive public hearings were held by the Senate Committee on Interior and Insular Affairs on Senate Bill 49, Hawaii Statehood Bill. The Department of the Interior submitted

138

a memorandum dated March 13, 1953, commenting, among other things, on air transportation with particular reference to the language "between places in the same State through the air space over any place outside thereof," as follows:

"Under the Civil Aeronautics Act (52 Stat. 977, as amended, 49 U.S.C. 1946 ed., sec. 401 et seq.), the Civil Aeronautics Board exercises economic regulatory jurisdiction over carriers engaging in interstate air transportation, overseas air transportation, and foreign air transportation. 'Interstate air transportation' is defined in relevant part to mean (a) transportation between a place in any State and a place in any other State, or (b) between places in the same State through the air space over any place outside thereof, or (c) between places in the same Territory of the United States. 'Overseas air transportation' is defined in relevant part to mean transportation between a place in any State and any place in a Territory of the United States.

"* * *

"Upon the admission of Hawaii as a State, the CAB would continue to exercise economic regulatory jurisdiction over air transportation between the State and the continental United States, by virtue of the portion of the definition of 'interstate air transportation' labeled '(a)' above. To the extent that the channels and waters between the islands comprising the land area of the State of Hawaii are not defined or considered to be a part of the State of Hawaii, the CAB would continue to exercise regulatory jurisdiction over air transportation between the islands by virtue of the definition of interstate air transportation labeled '(b)' above, * * *." (Senate Report 886, Committee on Interior and Insular Affairs, 83rd Cong., 2nd Sess., on S. 49, p. 87.)

As seen, the Congress did ultimately refer to "all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii * * *" as constituting the State of Hawaii, obviously attributing to "territorial waters" the recognized meaning thereof under the law of nations.

It is particularly notable that in the course of the hearings on Senate Bill 50, 86th Congress, which culminated in the passage of the Hawaii Statehood Act, there were discussions on the very subject of interisland air transportation because of the geographic characteristics of the Hawaiian Islands. The Civil Aeronautics Board expressed its concern about the jurisdictional aspect. (Hearings before the Subcommittee of the Senate Committee on Interior and Insular Affairs, 86th Cong., 1st Sess., on S. 50, pp. 52-61.)

Hearings concluded, the Senate Committee submitted its report embodying therein the following statement on "Aviation Matters," which, in my view, constitutes an unmistakable and convincing exposition of the basic legislative intent:

"Hawaii presents a unique situation with respect to the impact of statehood on the Federal regulation of air transportation between the main islands. This is because of the geographical structure of the Territory, the land areas being separated by substantial expanses of ocean which are not included in the territorial limits of Hawaii. Hence, most, if not all, of the interisland air transportation passes through airspace not a part of the Territory. Under the provisions of the Federal Aviation Act of 1958 and other applicable Federal legislation, the Civil Aeronautics Board exercises economic regulatory jurisdiction over carriers engaged in interstate air transportation, which is defined to include not only transportation between a

place in a State and a place in any other State, but also transportation between places in the same State through the airspace over any place outside thereof. *Consequently, with the admission of Hawaii as a State, interisland air transportation will remain subject to the economic controls provided by the Federal Aviation Act including other applicable Federal legislation, because that transportation, or most of it, while between places in the same State, will pass through airspace outside the State.* In the other States, air transportation of this kind passing through airspace outside the State is of slight volume in comparison with air transportation merely between places in the same State. In the case of Hawaii, the reverse would be true. *The committee wishes to make it clear that it believes the application of the provisions of the Federal Aviation Act and other applicable Federal legislation to the State of Hawaii should continue in accordance with the definition of interstate air transportation as contained in that act."* (Emphasis supplied)

With due deference, I am unable to follow the court's view that the word "place" as employed in the Federal Aviation Act of 1958 means "a specific area with definite physical limits." Lexicographers define the word in several alternatives ranging from the simple to the technical. The conclusion of Chief Justice Marshall, sitting as a Circuit Justice in *The Adventure,* 1 Brock 235, 1 Fed. Cas. 202, C.C. Va., *rev'd* on other grounds, 12 U.S. (8 Cranch) 221, upon which the court relies, has no application here. Upon analysis of a nonimportation statute which was in question, the conclusion was that the high seas were not a "foreign port or place." The Chief Justice did not observe or say that the high seas were not a place. Contextually and under the maxim *noscitur a sociis,* "place" as

used in the statute could not be construed as having any meaning other than a place in the class of a foreign "port." Suffice it to say that "place," in its common and popular usage, does not mean "a specific area with definite physical limits," unless clearly so intended by the user. As seen, the legislative history of both the Civil Aeronautics Act of 1938 and the Federal Aviation Act of 1958 evinces that the specific intent and purpose of the word "place" as used therein was to refer to *all* places, including the high seas, outside of any particular State.

A case squarely in point is *United Air Lines* v. *Public Utilities Commission of California,* 109 Fed. Supp. 13 (1952). The Commission sought to require airlines operating under authority of the Civil Aeronautics Board to file tariffs. The routes of flight included Catalina Island off the mainland coast of California. In holding the Commission without jurisdiction, the three-judge United States District Court of Northern California applied the language "through the air space over any place outside thereof," appearing in the then Civil Aeronautics Act of 1938, and said:

"The record here shows, by stipulation, that there is a distance of about 30 miles between the shore line of the United States and the Santa Catalina Island. We have no difficulty in finding, and so find that a substantial portion of these 30 miles lies over the high seas and is not within the State of California. Hence it follows that air transportation through the air space thereover is over a place outside of the State of California.

"The Congress, by the statute, assumed jurisdiction over this area. This it had the power to do. In this field it has supremacy. Since the Congress had the power to assert federal jurisdiction, the plain language of the statute compels the conclusion that the Public

Utilities Commission of the State of California has no jurisdiction or power to regulate in any manner the transportation activities of the plaintiff over the route in question."

Upon appeal to the United States Supreme Court, the judgment in the above case was reversed, not on the merits thereof respecting the jurisdictional issue, but on the ground (upon authority of *Public Service Commission* v. *Wycoff Co.*, 344 U.S. 237) that the declaratory judgment procedure pursued in the lower court was inappropriate under the Declaratory Judgment Act. *Public Utilities Commission of California* v. *United Air Lines*, 346 U.S. 402. As seen, although reversed on other grounds the lower court's decision in *United Air Lines, supra,* may be deemed to succinctly present a sound rationale compatible with the historical background of our national legislation on air transportation.

In holding that the Island Airlines is not subject to the jurisdiction of the Civil Aeronautics Board on the ground that, because its flights will not traverse the airspace of "any other jurisdiction" there will be no operation through the airspace over any "place" outside the islands, this court advances a theory which, in my opinion, is susceptible to the implication that neither the United States Government nor a foreign nation may assert any semblance of jurisdictional authority over the airspace above the high seas between the islands. In the Congress is constitutionally vested the exclusive power to regulate commerce among the states and with foreign nations. "The power to admit new States resides in Congress. The President, on the other hand, is the constitutional representative of the United States in its dealings with foreign nations. From the former springs the power to establish state boundaries; from the latter comes the power to determine how far this country will claim territorial rights

in the marginal sea as against other nations * * *. It is sufficient for present purposes to note that there is no question of Congress' power to fix state land and water boundaries as a domestic matter." *United States* v. *Louisiana*, 363 U. S. 1, 35. *Cf.*, Higgins, International Law of the Sea (Fourth Edition by John Colombos, p. 60 (1959)).

Under its power to regulate commerce, interstate and foreign, the Legislative Branch of the nation prescribes by enacting appropriate laws the manner in which transportation facilities are to be operated. To the Executive Branch, on the other hand, is entrusted the executive and diplomatic functions of dealing with foreign nations in all matters pertaining to treaties and the law of nations. The use of airspace and the high seas from the international point of view is a matter with which the United States Government is deeply concerned. The ocean areas beyond the marginal waters of each island and the airspace over them are clearly places or a "place" in, to or concerning which the United States Government can assert its rights. By the same token, foreign nations too may do likewise. I therefore find it difficult to rationalize the court's theory.

I do not perceive that in connection with the use of the word "place" in the Interstate Commerce Act in respect to the means of transportation such as rail carriers, water carriers and motor vehicle carriers (49 U.S.C. § 902(i), § 1(1), § 303(a)(10),(11)), there is, or there was intended to be, any relationship comparable to the use of the same word in the Civil Aeronautics Act of 1938 or the Federal Aviation Act of 1958. It is evident that the one was clearly intended to apply to any state or country and the other, to the high seas as well as a state or country. The language of the latter "between places in the same State of the United States through the airspace over any place outside thereof," is *sui generis* and was employed specifically to comport with the meaning

144

ascribed thereto by the Federal Coordinator of Transportation. To that extent, the Interstate Commerce Act cannot be deemed a law in *pari materia* as that term is generally used in statutory construction.

Summarizing, it is my view that in declaring the State of Hawaii as consisting of all the islands including "their" appurtenant reefs and territorial waters, the Congress manifested its recognition of the universally accepted law of nations establishing the off-shore extent of waters surrounding each island; that to remove any possible adverse claim, the electors were required to cast their votes—which they did affirmatively—on the proposition as to whether the description of the State as set forth in Section 2, Hawaii Statehood Act, was acceptable to them and also whether they would irrevocably relinquish "all claims of this State to any areas of land or sea outside the boundaries so described;" that for the maintenance of uniformity in the regulatory control of air transportation of persons and property, the Congress under its power over interstate and foreign commerce established such agency as the Civil Aeronautics Board to supervise such transportation moving in commerce over places including the high seas to the extent that domestic air carriers are concerned; that in the light of the legislative history of the Federal Aviation Act of 1958, the conclusion is inescapable that the phrase "through the airspace over any place outside thereof," was written into the Act to include the high seas; and that the United States Government, in its concern for the proper regulation of domestic air carriers, has dominion and sovereignty over the airspace above the high seas, even though other nations may share such dominion and sovereignty.

I would reverse the decision and order of the Public Utilities Commission for want of jurisdiction in that body to regulate interisland air transportation by the Island Airlines.